**United States Bankruptcy Court**
**Southern District of Indiana**
**Indianapolis Division**
**46 E. Ohio St.  Room 116.**
**Indianapolis, IN. 46206**

| | | |
|---|---|---|
| IN RE: | ) | Case  23-05593-RLM-7 |
| | ) | |
| Rodney Grubbs, | ) | Adversary  No. 24-50097 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| _____ | ) | _____ |

CONNIE ADAMS, MARK ADAMS, SANJIV AGGARWAL, TERESA AMICK, LARRY AMICK, WAYNE AMRHEIN, LYNNE AMRHEIN, DIANE AZAR, PETER BASSEL, RUTH BAUERLE, ROBERT BAUERLE, SANDRA M. BECKETT, KATHRYN BIARKIS, ROBERT BIARKIS, MARCO BIGGS, JOE BISCHOFF, DORIS BISCHOFF, GARY BISCHOFF, GLEN R. BISCHOFF, TINA BISCHOFF, SUSAN BORREGO, DENISE BOUTIN, JILL BRACK, ABIGAIL BRANDENBERGER, BETTY BRANDENBERGER, JON BRANDENBERGER, MATTHEW J. BRANDENBERGER, JENNIFER BUTLER, CAROL CAPION, HELEN CARLSON, RICHARD CARLSON, APRIL CARPENTER, RAYMOND CARPENTER, MICHAEL KEVIN CARVER, JULIE CARVER, MICHAEL C. CHAPIN, VIRGINIA B. CHETTA, GREGORY E. CHETTA, WILLIAM CIFERRI, CATHY CIFERRI, ELDONNA COATS, MICHAEL COATS, STEPHEN COLE, JEFF CONRADI, THOMAS COONEY, JANA S. CORBIN, DOUGLAS C. CORBIN, MICHAEL CRABTREE, SANDRA CRABTREE, KEN CURRY, PATTY CURRY, MARK A. DALY, DIANA M. DALY, ROB DAVIDSON, SHONDA DAVIDSON, TERESA L. DEAKIN, BONNIE DEAN, RUDOLPH DEAN, REBECCA L. DEHENNIS, ANDREW C. DEHENNIS, CHERILYN DRAKE, LESLIE DRAKE, JANICE S. DUPRE, GARY W. DUPRE, SANDY EINHAUS, JOHN EINHAUS, DANIEL ELLSWORTH, ANDREW EVANS, PATRICIA GALLEGOS, AARON GARZA, DARIO GARZA, JOE HUNTER GILMORE, CAROLINE GILMORE, GRACE RITZMAN REVOCABLE TRUST, BRENDA GREEN, FRANCIS GREEN, RICHARD J. GRIFFITH, MARY ELLYN GRIFFITH, KELLI GRIMES, GREG L. GRIMES, GERALDINE L. GRODZINSKY, GEORGE C. GROSS, JR., SHARON L. GUINGRICH, JOHN GULLO, CRAIG HALEY, PAULA J. HANDRUP, JACK HANDY, LYNN HANDY, MARILYN HASLUP, THOMAS HASLUP, MARILYN HEDRICK, JEAN MARIE HEFFRON, TIMOTHY PAUL HEFFRON, SUSAN HENDERSON, TERRY HENDERSON, KEITH HENSEL, RONALD HENSEL, GREG HILLIGOSS, PAM HILLIGOSS, DAVID HITESHEW, MARY HITESHEW, MARILYN JEAN HOLLADAY, KAREN J. HONEYCUTT, LARRY L HONEYCUTT, ROBERTA S. HOOKER, WALTER C HOOKER, RICHARD HORNBUCKLE, LORNA HORNBUCKLE, KEVIN HUFF, ERIC HURST, SANDI HURST, CARLA LYNN INGRAM, KEVIN INGVALSON, ANDREA INGVALSON, GRACE JAWORSKY, LISA KARSTEN, EDWARD A. KARSTEN JR, ROBERT MARK KELLAM, JOAN FRANCIS KELLAM, DAVE KERSEY, CRAIG KING, JANE A. KING, ERIC KINGSLEY, KATHERINE KINGSLEY, JASON KORNREICH, SHAWN KORNREICH, EVELYNE KORNREICH, ELLIOT KORNREICH, JAMIE WILLHELM KOVATCH, DENISE KRAMER-COLE, RACHAEL KROOG, VIRGIL KUNKEL, BERNADINE KUNKEL, SHARON KVISTAD, WILLIAM KVISTAD, PENNY LAKOFF, TIM LAKOFF, AARON LAMPORT, CAROL LAMPORT, NANCY LAMPORT, NORMA LAMPORT, KYLE LARAMIE, RACHEL LARAMIE, BARB LEFFINGWELL, JULIANA LEHMAN, RICHARD LEHMAN, ANDY LEIGHTON, RANDI LEVENBAUM,

BRANCH R. LEW, MARCIA E. LEW, ROBERTA B. LITTLE, HEIDI LOUIS, GERALD LOUIS, JACK LOVINS, SUE LOVINS, JUDITH A. MAHURON, STEPHEN L. MAHURON, JAMES MARINO, LEONA S. MARINO, LEONARD B. MARINO, JEFF MATHEWS, ROBERT MCCARTHY, LEVI MCCASHLAND, CORINNE MCCRAY, STEPHANIE MCDONALD, JEANINNE MCKINNA, DAN MCLAUGHLIN, KATHLEEN MCLAUGHLIN, CHARLES A. MITCHELL, FLORIN MOLNAR, MARTHA MULLIN, KEVIN MURPHY, JANE MURPHY, MICHAEL MURPHY, CLARK E. NEAL, KAREN NIEDENTHAL, KAREN S. O'HARE, RANDALL S. O'HARE, CHARLES OGLESBY, LORETTA OGLESBY, ERIN OVERHOLT, RYAN OVERHOLT, KENNETH PALMER, SANDRA PALMER, GUY PASELA, MARIAN PASELA, LARRY PECK, DEBBIE PECK, PHIL PICHE, SHANNON PIERCE, RONALD PONDER LIVING TRUST, PETER POPOVICH, VIRGINIA POPOVICH, DIRK PRUIS, DAN PURCELL, STACY PURCELL, DONALD QUIRION, LINDA QUIRION, PATRICIA A. RATHBURN, KEVIN M. REED, CHRISTOPHER REISERT, EMILY REISERT, ANNE RHEINS, TODD RHEINS, SHARON RICHARD, RAYWOOD RICHARD, DEBORAH ANN RICHTER, ROBERT E ROMAGOSA, IRENE ROMAGOSA, MARY SACKSTEDER, SCOTT SCHIRMER, DALE F. SCHNARR, TERI L. SCHNARR, MICHAEL SCHWEGMAN, AMANDA SCHWEGMAN, KATHY SHELLY, SCOTT SIEWERT, TERI SIEWERT, CHERYL SILVERMAN, LAWRENCE SILVERMAN, DALE SLOAN, ROBERT SMUTKA, ST. LOUIS PICKLEBALL LLC, SHERRI STEINHAUER, KAROLYN STIPECK, BETTY SULLIVAN, GEORGE SUNDRUP, GEORGE SUNDRUP, MIKE TAFELSKI, PATRICK TAFELSKI, RITA TAFELSKI, SHAUNNA TAFELSKI, CHIEN TANG, STEVEN G TAYLOR, FRED THOMPSON, IAN TITUS, BYNUM TUTTLE JR., ROBERT M UNETICH, POLLY UNGER, JOHN URBAN, JANET URBAN, ALAN VOHS, JACKIE VOHS, BETTESUE WACHHOLZ, JOHN R WACHHOLZ, SHANE WATSON, HOWARD WEISBART, BRYAN WENTZ, BILL WERNER, EMMA WERNER, PATRICK V. WHELAN, PATTY ANN WHELAN, HELEN WHITE, NANCY WHITEMAN, ANNETTE WILLHELM, DAVID WILLHELM, WILLHELM BROTHERS FARMS LLC, CAROL RENE WILSON, WILSON'S GAME ON, LLC, ELLEN BEATRICE WINDJACK, JAYSON WINDJACK, GREG WOODSUM, and MELODY WOODSUM,

Plaintiffs,

v.

RODNEY GRUBBS,

Defendant.

---

## ANSWER OF DEFENDANT RODNEY GRUBBS
### TO COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT
### PURSUANT TO 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), AND 523(a)(19)

Defendant for its Answer to the Plaintiffs' "Complaint to Determine Non-Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6) and 523(a)(19)" ("Complaint") states as follows:

## *Jurisdiction and Parties*

1. Defendant admits that this is a core proceeding and this court has jurisdiction pursuant to 28 U.S.C. § 157(b).
2. Defendant consents to entry of final orders or judgments by the bankruptcy court.

3. Defendant denies that, per Paragraph 3 of the Complaint, each Plaintiff is an unsecured creditor of the Debtor who has filed a claim in the bankruptcy case 23-50093. Plaintiffs Scott Siewert, Teri Siewert and Richard Carlson are not shown on the Claims Register for this bankruptcy case.

4. This Answer is timely, having been filed by the October 3, 2024 court assigned deadline for answering this Complaint.

## Procedural Background

5. **I, Defendant Rodney Grubbs deny all the allegations of fraud contained within Paragraphs 8 through 40 of the Complaint.**

6. **I, Defendant Rodney Grubbs deny all the allegations of lies within Paragraphs 8 through 40 of the Complaint.**

7. **I, Defendant Rodney Grubbs deny any pre-planned 20+ year alleged scheme or plan to defraud any person or persons who chose to loan money to me.**

## Statement of Relevant Facts

8. **THERE ARE MANY ACCUSATIONS, ALLEGATIONS AND ABSOLUTE FABRICATIONS WITHIN THE 40 PARAGRAPHS OF THE PLAINTIFF'S <u>COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), AND 523(a)(19)</u>**

9. **THE INFORMATION SHARED BELOW ADDRESSES ANY OF THE COMPLAINT'S PARAGRAPHS THAT USE THE WORDS "LIES", "FRAUD", "FRAUDULANT", "LURED" OR "SCHEME". THE FLIPPANT USE OF THESE WORDS THROUGHOUT THE COMPLAINT ARE MISLEADING AND NOT BASED IN FACT.**

10. **This answer will also clarify all the timeline errors contained in the complaint.**

11. ***RE: Complaint Paragraph 8:** It states that "For more than twenty years until the end of 2023, Grubbs ran a fraudulent investment scheme".*

What the plaintiff's attorney (Foster) is attempting to do, is to take 20+ years of my life and put them into a nice, neat shoebox where everything and everybody was treated the same as part of a well devised master "scheme".

I wish I had that kind of ability to prognosticate like that in the year 2000. I would have avoided the big technology stock market crash (2000 – 2002) where I lost a substantial part of my corporate retirement savings. I would have certainly not been investing in real estate during the devastating real estate and banking industry crash from 2008 through 2011 and beyond. I also would never have started a pickleball apparel company had I known what was going to happen on March 11, 2020 with the start of a pandemic that would not end for many businesses like mine until the end of March 2022 with the lifting of the government mandated eviction moratorium.

What was consistent during all of the 20+ years is the fact that there was never a "plan" or "scheme" to fraudulently take anyone's money. Even in the worst of economic times, any money borrowed was always with full faith that I would repay the person(s) who chose to loan their money to me.

Each of the following periods of time were very different for me and the many friends who loaned me money during the 20+ years covered in the complaint.

2000 - 2003

2004 - 2007

2008 - 2012

2013 - 2019

2020 – 2023

Below I will provide details for each time period and then provide a summary at the end.

**12. 2000** – The Stock Market Tech Crash

In 2000 I was working as a corporate data analyst for AT&T.  I had my 401K retirement account growing nicely when in March 2000 the stock market tech crash began, wiping out almost half of my retirement account. I rode with the market for awhile, hoping some of the tech companies would recover, but many did not.  So in late 2000 I moved my remaining 401K funds totally into cash. I made a personal commitment that I would never invest in the stock market again.

**13. July 3, 2002** – My First Investment Real Estate Purchase

In July 2002 I began personally investing in real estate by purchasing my first rental property (actually properties).  This first purchase was for 4 low income, single family homes on Ann Street in Newport, Kentucky. This first deal was with a For Sale By Owner and I made the purchase with no money down using a purchase strategy from the popular Carleton Sheets No Money Down Real Estate course.  To further my real estate investment knowledge, I become a member of the Cincinnati Real Estate Investors Association.  So this was the beginning of my real estate career.

14. **May 2003** – In less than a year I had acquired 12 rental properties valued at $750,000.  All of these projects were funded by me personally.

15. **December 27, 2003** – I took an early cash and medical benefits retirement package from AT&T.  I cashed out both my 401K and pension to use for investing in rental real estate projects.

16. **October 2004** – Because of the success I was having as I accumulated rental properties with little to no money down, the Cincinnati Real Estate Investors Association asked me to do some training seminars to help other real estate investors. It was at these first seminars that some rehabber/flippers asked me if I knew of any sources for them to get funds to buy/rehab and sell houses. So after looking at a couple of their proposed projects, I decided to personally fund a couple of them, and became what is known as a **hard money lender.** They were a safe, secure way to invest my funds into real estate.  It wasn't long before I had more proposed rehab projects than I could personally fund.

**It is very important that the court knows what a typical hard money lending project looked like.** When a rehabber wanted funding to buy, rehab and sell a property, I required them to submit an application that showed a proposed project schedule and purchase price plus the proposed itemized rehab list and costs.  I would research the potential completed property sales price and then would agree to loan them up to 65% of

their total purchase/rehab cost. They were required to provide proof of insurance before I would provide the first round of funding. They were also required to provide me with a signed mortgage which was immediately filed and a Quit Claim deed showing me as the owner. The rehab funds were actually given to the flippers in draws during the process. Not all up front.

The typical length of time to pay back their loan from me was 5-6 months.

At the end of the project, the rehabber always had two possible ways to pay me back.   They could either sell the property to a new homeowner and pay me from the sale, at which time I would release the mortgage. Or, since they borrowed only 65% of the rehabbed value of the property, they could go to any secondary mortgage company and easily get a refinance loan to pay me off.

This process worked beautifully and created a great opportunity for me and some friends who would become private lenders to me.

17. **November 21, 2005** – Because I soon had more proposed rehab projects than I could fund with my money, I reached out to a personal friend to see if he wanted to fund one.  His response was that he would fund it as long as I handled everything associated with the project.
So for a rehab project at 116 E. Parkwood Drive in Richmond, Indiana, I borrowed $37,000 from friend EK.  I agreed to pay him an 18% APR for up to five months.  On March 20, 2006 I repaid him $39,018.97 for a profit for him of $2,018.97.

18. **2006** – Because of the abundance of rehab projects being presented to me, I invited some new families on board as lenders in 2006.  All together, we funded approximately $2.3 million dollars into dozens of rehab projects.

19. **2007** – Through word of mouth, additional families chose to loan on these rehab projects.  So in 2007 we funded 70-75 projects with approximately $3.5 million dollars and many of the families funding multiple projects simultaneously

20. **October 29, 2007** – An Indiana Securities Division Inquiry.  This inquiry was triggered because a potential investor (ST) simply checked with the Better Business Bureau and the Secretary of State to see if there were any red flags to what I was doing. At that time I had developed a full color brochure describing the type of real estate related projects (rehab/flips), plus a website.  I was filing a mortgage on each piece of real estate that I loaned money on so that the rehabber could not obtain any additional funding and over leverage the property. So for the inquiry, I supplied all their requested documentation including names and contact information for all my Indiana investors. I was represented by Jeffrey Bailey of the law firm Bose, McKinney and Evans, LLP.  The main thing that I learned from that inquiry was to not operate as a business entity, specifically a mortgage company. Otherwise, I would be required to have all the proper securities related licenses.  I left that inquiry believing I was fine operating as an individual with friends loaning me money for personal projects.  So out of that inquiry, I password secured my website that had contained investment information, plus I agreed to dissolve the LLC business entity and destroyed all my marketing pieces.

Additionally, I created no more mortgages and all promissory notes provided to private lenders, have stated that it is a "personal loan" and that there is absolutely no security of any type attached to the loan.  From that time forward, everything I have done with any private investor friends has always been with me personally and not a business entity.

21. **2008 was a very significant year for two important reasons.**

**REASON #1:**
**I was introduced to the sport of pickleball.**

22. **November 3, 2008** – I launched the AllAboutPickleball.com website.
It was a website where new players could ask any question about this still very new sport and get a direct answer from me.
It was the first website to be able to sell a paddle and allow customers to pay by credit card. I began selling paddles for pickleball Hall of Famer, Mark Friedenberg @ ProLite Sports

23. **December 2008** – With a household iron and some iron on letters, I bought a white cotton tshirt and created a shirt that said "Pickleball Rocks!" The only reason I created that shirt was to be a conversation starter for people hearing about the sport of pickleball for the first time.  It was meant to attract people to the sport.

Soon after creating that first shirt, I began wearing it to play in my first tournaments, and players began asking where they could get one.  So the Pickleball Rocks brand became a reality.  I printed a few shirts and began selling them at small tournaments that I played in. It was a nice hobby and I had no big vison for it then because the sport itself was at that time so small.

**REASON #2:**
24.  **2008 was also the beginning of the huge Real Estate and Bank/Mortgage collapse of 2008-2010.**
It was so bad that the federal government was bailing out some of the
banks. Most secondary mortgage companies went out of business and
**this had a tremendous impact on my investing future and would**
**forever change my life.**

**How did this impact me personally?**
The real estate crash hit very quickly and with the evaporation of the secondary mortgage market, it was not long before rehabbers/flippers were not able to sell their completed properties, or refinance them, to pay me and my lender friends back.

From **2008 through 2010** I paid interest when I could to my investors while going through the long process of claiming 32+ properties that I had loaned 2.3 million dollars on. When the dust cleared, I had 32+ additional properties with some of them in perfect rehabbed condition, but many still needing rehab before they could be sold or rented.
This concluded my hard money lending and instead, because houses could not be sold or refinanced, turned me into a full time landlord holding many single family and multi-unit properties, and it left me millions of dollars in debt to my friends, plus $180K in personal credit card debt from finishing the needed rehabs.

During this time I had some new lender friends come on board to replace investors who needed to cash out. These new investors and any investors brought in later, were always fully aware of what their money was being used for. Everyone was very patient as I navigated this strange time where my only income was essentially the rent roll from the newly acquired properties.

25. **2011** – The Second Indiana Securities Division Inquiry
This inquiry was not triggered by any one particular event. Rather it was a followup from the 2007 inquiry to make sure I had followed through with their guidance. Once again, I retained Jeffrey Bailey of Bose, McKinney and Evans, LLP to make sure everything was presented properly. Every investor was disclosed along with all the things we had done during the period from the 2007 inquiry forward.  Still to this day

I remember one of the investigators saying that if I had done $50 million more, the federal government would have helped bail me out like they were the banks. He said it in jest, but the fact was that the real estate crash did create a long tough road to assuring all my investor friends would eventually get their money back. **My full deposition was recorded at their office in Indianapolis and no enforcement actions were made or fines levied.**

At this point in time, I believed that the rental portfolio would be able to pay at least some interest to my investors until the depressed property values from the crash appreciated enough to be able sell them and pay off a good portion of my investor debt.  Unfortunately, these low income neighborhood properties would never appreciate and because of the high interest rates I had agreed to, I slowly grew further into debt to my investors.

26. 2013 – Though I was deeply in debt, my hobby level pickleball apparel business was starting to get traction.  It was slow growth because I had little money to use from my real estate income.  Almost everything I made from any of my projects went towards paying interest to my real estate investors.  But more importantly, you could sense the growth momentum of the sport was beginning to take off as every state now had pickleball courts available for play and players were learning to play in droves.  So in March of 2013 I decided to officially take the Pickleball Rocks brand nationwide.  I started by applying for the official US trademark and was granted it in October.  I also created a simple 5 page marketing plan for growth. I have always called it my Pickleball Domination Plan.  That very same document today (2024) is over 90 pages and, until the bankruptcy, guided the growth of the Pickleball Rocks brand with many projects needing funding over the years.
**My pickleball sales in 2013 were $35,460.**

27. 2014 – Making sales in person at pickleball tournaments becomes the foundation of my marketing plan.  Every player who purchases a Pickleball Rocks shirt at a tournament becomes a walking billboard for us.  Other players see those players wearing our shirts and they go online to purchase their own.  In 2014 we had a Pickleball Rocks table or tent selling at 17 tournaments.
**My pickleball sales in 2014 were $74,960.**

28. 2015 – The Sports and Fitness Industry Association report is what many Fortune 500 companies use to determine which sports to support with their advertising and marketing dollars.  The SFIA report in 2015 showed that the sport of pickleball had hit 2,000,000 players and was on a great upward trend.
**My pickleball sales in 2015 were $80,121.**

29. 2016 – You could feel the growth of the sport simply by attending the tournaments.  The number of players playing in each tournament was doubling year over year.  And by the time we got to the end of summer, our sales had already surpassed our total 2015 sales.  The only thing holding us back was having more product to sell.  I had very little money in the bank because almost all the sales revenue was being put right back into just enough inventory to support each upcoming tournament and online sales.  Most of my profits was used to pay interest to my real estate investors.  So in September 2016 I shared with some families, how I was trying to grow Pickleball Rocks, but needed additional capital to do it.
Those original families each invested $17,500 - $25,000 with a promise to pay them a 12% interest rate for the next 6 months.  At the end of the 6 months, I paid each of them their accumulated interest.  Those families happily reinvested their money for another 6 months to help Pickleball Rocks grow.  This was the beginning of growing Pickleball Rocks using private loans.
**My pickleball sales in 2016 were $135,370.**

30. 2017 – Many of my early real estate investors are accruing their interest in anticipation of their future retirements.  But the rate of interest growth is outpacing the appreciation and income of the real estate so my debt continues to grow. I'm using almost all my pickleball profits and some of my investor

capital to support the business debt, while continuing to build and have faith in the continued growth of the Pickleball Rocks brand.
**My pickleball sales in 2017 were $174,340.**

### 31. 2019 – The Great Year Of Preparation.

The Sports and Fitness Industry Association report shows that pickleball has now grown to 3.3 million players. The two main online tournament calendars are now showing 15 or more tournaments scheduled across the country every single week, year round. Our marketing document is now over 75 pages detailing our many online assets plus many ideas for the future.  The foundation of our marketing is still in-person tournament sales. This strategy continues to work very well.  I know that every piece of apparel that we sell at a tournament becomes our best advertising when those players wear them later in their communities.

**This was a significant year in the growth of the Pickleball Rocks brand, but more importantly in my planning for future pickleball sales.**

I personally sold Pickleball Rocks apparel from one of our vendor booths at 38 tournaments in 2019.
Additionally, we had the apparel being sold at 50 other tournaments throughout the year.
I now know that apparel sales from tournaments have a direct and mostly predictable correlation to the growth of our online sales.
By now I know that the average tournament generates $2000 in sales.  And I know that there will be an additional 30-35% short term bump in online sales, created from the wearing of those $2000 worth of shirts sold at each tournament.

Because pickleball is growing so fast and the number of tournaments is also increasing rapidly, I spend a great deal of time contacting tournaments that will be held in 2020.  The goal is to get Pickleball Rocks scheduled for sale at 4-5 tournaments each and every weekend in 2020.

**2019 sales jump to $224,335 and a big portion of the profits is used to pay investors.  Many social media polls are independently conducted and all show the Pickleball Rocks brand as the best known pickleball apparel brand in the country.  The brand is now poised to have huge gains in the coming years.**

**With the increase in the number of tournaments that will now be selling the Pickleball Rocks brand in 2020, plus the associated jump in online sales, I conservatively projected revenues for 2020 at $500,000 followed by projected revenues in 2021 of $750,000 and 2022 being our first million dollar year.**

### 32. 2020 – The Year of Disaster.

I go into 2020 with the conservative end of year goal of $500,000.  Beginning in March of 2020, the covid pandemic hit pickleball and wiped out every indoor and outdoor tournament, thus costing my business over $400,000 in unrealized revenues.  Just as damaging was the fact that within the first six months of 2020, over half of my rental tenants lost their jobs either through layoffs or business closings. So in 2020 I still have a very heavy, increasing debt load, but now my real estate rental income is cut in half and my pickleball sales are well short of the projected $500K for the year. To top off this disastrous year, in September the government imposed what was known as the Eviction Moratorium which prohibited me from evicting the non-paying tenants from any of my rental properties.
**Our pickleball sales for 2020 were only $196,585.**

### 33. 2021 – Year Number 2 of Disaster.

The pandemic continues and almost all tournaments are cancelled for 2021 causing lost revenues of over $500,000.  Half my real estate rentals have non-paying tenants which I'm not permitted to evict because of the

continuing Eviction Moratorium.  I am losing properties to tax sales.  I am running deeply in the red and take out tax payment plans for almost every remaining property.

In an attempt to create more online sales, I launch two new pickleball apparel brands (Unstoppable Pickleball and Legendary Pickleball).

**Our pickleball sales for 2021 were $273,487.**

34. **2022** – In March of 2022 the Eviction Moratorium is finally lifted and the rebuild of my real estate portfolio begins by evicting 15 families. Almost all of the newly vacant houses needed some type of rehabilitation.  Some needed little but some had costly rehabs needed before they could be rented again.  So with no money in the bank, I slowly began preparing the properties one at a time.  It took until spring of 2023 to get every house rent ready and occupied again.  Pickleball tournaments came back in full force in 2022, but many of the old tournament directors were no longer associated with those tournaments, so I began reaching out and introducing the Pickleball Rocks brand to the new wave of tournament directors.  The rebuilding of our 2019 momentum is under way, but I know it will take time to get back to the 4-5 tournament per week sales level.  With the crushing old debt plus the Pickleball Rocks brand poised for a great rebound, I am bringing on many new investors to have the needed immediate capital.

**My pickleball sales for 2022 were $350,824 and a large portion of the profits are paid to investors.**

35. **2023** -  By the end of 2023, the momentum had almost fully returned. 2023 sales were $350K+ and many interest payments were made to investors.

In the spring of 2023, the Topline Participation Report from the Sports & Fitness Industry Association (SFIA) named pickleball the fastest-growing sport in America for the third year in a row. According to the report, pickleball is now up to a total of 8.9 million players in the United States, so the future is very bright for the sport.  And the future was very bright for the growing sales and profits of Pickleball Rocks, which has now been liquidated and sold as part of the bankruptcy estate.

## AFFIRMATIVE DEFENSES

1. I the Defendant have 100% cooperated with all requests for information from Trustee, Joanne Friedmeyer and attorney Joseph Mulvey.

   Additionally, I have cooperated fully with all requests for information from the Department of Justice, the Indiana Securities Division, and the Attorney General of the State of Indiana.
2. The Indiana Securities Division issued a Cease and Desist Order in January 2024 and I fully complied well before the bankruptcy trial on February 7, 2024.
3. The Attorney General of the State of Indiana has also fully completed and officially closed their recent investigation with no action taken.  This was two weeks ago.
4. Defendant provided early signatures on requests for subpoenas for my financial records so that the 2004 Exams could get underway as quickly as possible.

   I did so, knowing that the discovery in the 2004 Exams would show that, contrary to the claims that I have rarely paid any of my lenders, many of my lenders were either paid fully or took interest payments over the last 20 plus years.  What has never been asked, because it really had no prior bearing on the involuntary bankruptcy proceeding, is how many people have been either paid off completely (there are dozens) or taken interest payments over the 20+ years.

By now, the 2004 Exams should have answered those questions, showing dozens of investors who were paid off completely, plus hundreds of interest payments paid to investors.

The 2004 Exams also support that people did in fact loan money to me personally and NO money was ever used, contrary to Foster's repeated insistence to his clients, to buy or hide any major assets like homes, or autos or boats or jewels or offshore accounts.  Many of my local friends loaned money to me over the years and they will certainly confirm or testify under oath that I still live in the same 6 room house that I paid $49,000 for 38 years ago.  I still drive 15 year old used cars and live the same frugal lifestyle that I have my whole adult life. If there had been any exorbitant personal use of my lenders' money, I'm sure someone in our small community would have noticed.

The 2004 Exams will additionally support that I consistently deposited money obtained from these loans into my bank accounts at only two banks. So there was no effort to hide anything. Additionally, I deposited into those banks, money made from various other sources, including but not limited to profits from making loans to rehab contractors who were flipping houses, internet consulting fees, sales from the Pickleball Rocks brand, and my salary and bonuses from my AT&T career.

The 2004 Exam discoveries will further support that there was never a grand 20+ year ponzi scheme as has been alleged many times since the first Siewert social media post on 12/9/2023.

**5.** Additional support for defending the accusations of a ponzi scheme are provided by the audio file from the February 7, 2023 bankruptcy hearing/trial.

 At the February 7, 2023 trial, the petitioning attorney (Foster), presented three witnesses who each testified to a specific reason why they loaned money to me.  Each witness stated that I asked them specifically for a loan to pay off an existing lender and that the existing lender had a need to cash out their note prior to the maturity date of their loan.  All three of Foster's witnesses (Woodsum, Carpenter and Gilmore) made well informed decisions to make those loans.  And with all three of those individual loans, I fully paid off each of the requesting lenders. The fact that I asked those witnesses for a personal loan to pay off someone else, does not meet any element of a ponzi scheme.

**6.** Over the 20+ years there were numerous occasions where a lender had an emergency need to cash out some or all of a note prior to the note's maturity date, and I tried to accommodate their requests when possible.

**7.** I have always stated the reasons why money was needed, and I always made it clear that they would be making a personal loan to me with no security.
And in the vast majority of cases I memorialized the loan request and provided them project specific information with a personal email to the potential lender.

**8.** These individual emails detailed the specific project and the money needed at the time.  They also made clear that any loan would be a private personal loan.  Then importantly, each email told how much money I was trying to raise and made it clear that there was a last slot available for that particular project.  All the individual projects are detailed in the marketing plan titled "The Pickleball Domination Plan".  That Powerpoint document was provided by email to the lender prior to them making their loan.

I don't know how I could have made it any clearer before they chose to make their loan to me.  There was no lies, deception or fraud involved.

**9.** It is unfortunate that economic events outside of my control have impacted my efforts numerous times over the years, but my efforts were always in the best short term and long term interest of my investors.

If we are looking for the truth, I have fought to pay my lender friends for all these years.

10. Did I lie to get them to loan me money? **NO. THE TRUTH WAS SUFFICIENT.**

11. Was there high pressure to invest? **JUST THE OPPOSITE. I ASKED THEM TO BE SURE IN THEIR DECISION BEFORE LOANING ME ANY MONEY. MOST OF THE TIME I EVEN SAID AS MUCH IN AN EMAIL. MOST OF THE LISTED PLAINTIFFS SHOULD HAVE THOSE ORIGINAL EMAILS.**

12. Was money taken with no intent to pay it back? **NEVER HAS DEFENDANT TAKEN A PERSONAL LOAN WITH AN INTENT TO NOT PAY IT ALL BACK.**

13. Foster repeatedly refers to the "scheme" when in fact I have been merely an entrepreneur trying to make a living for the last 20+ years.  Unfortunately for me, the living has been meager at best as I've always paid investors ahead of paying my own personal bills. Many things changed in our economy during those years and I adjusted, always with an intent of repaying my investors.

14. **THE FOLLOWING SUMMARY REPEATEDLY REFUTES THE COMPLAINT'S ALLEGATIONS OF A 20+ YEAR SCHEME:  EVERY PERIOD WAS VERY DIFFERENT.**

**2002 – 2005**: I purchased rental properties using no-money-down techniques. I used all my own money.

**2004 – 2008:** I became a hard money lender, loaning money to midwest contractors to fund rehab/flip real estate projects. I used my money and invited friends to fund them as well with me managing the projects.

**2008 – 2012:**  I, with knowledge gained from **two Indiana Securities Division inquiries**, navigated the huge real estate and banking industry crash.  I ceased funding new real estate projects.  I foreclosed on many of the properties where I had money (mine and friends) loaned to rehabbers. Because of the severity of the crash impacting property values, these properties were converted to rental properties and the rental income was used to pay interest to investors.  The recorded deposition with the Indiana Securities Division will bring a lot of clarity to how I operated during this time period.
During this period I also was introduced to the sport of pickleball and began selling apparel and equipment to the players.  Pickleball sales started in 2008.

**2013 – 2023:**  This time period was used almost exclusively to grow the Pickleball Rocks brand.  By the end of 2019 it had attained national recognition as the most recognized pickleball apparel brand in the country and was on track to hit the million dollar sales mark within the next 2-3 years.  Unfortunately, the Covid pandemic destroyed that momentum and almost put it totally out of business.  Almost all of my apparel competitors went out of business during the pandemic including #2 and #3.  Thanks to the investors who did fund the new projects that allowed the business to continue as I rebuilt the sales funnels. By the end of 2023, the momentum had almost fully returned. 2023 sales were $350K+ and many interest payments were made to investors.

The future was very bright for the growing sales and profits of Pickleball Rocks, which has now been liquidated and sold as part of the bankruptcy estate.

**15. THE DEFENDANT REFUTES THE COMPLAINT'S ALLEGATIONS OF LIES AND FRAUD.**

Foster claims lies and fraud throughout the complaint, but for 10 months now has never provided any evidence or proof to substantiate these claims.
The likely reason for Foster not providing proof is because the time periods were so very different with many different types of projects needing funding.  There could never have been a 20+ year scheme.  Most of the plaintiffs listed in this complaint were provided with personal emails that were very specific to a specific project

in terms of amounts needed, number of possible slots, and almost always a written plea to the lender to make sure they were totally comfortable making a personal loan that would not be secured. Those individual emails will clearly show there was never a pattern of lies or fraud of any type.

16. And finally, did I insist that lenders not tell other people about their investment?  Again, I will refer you to the individual plantiff's emails.  I know I never insisted, but rather used the word "please" when I asked them to not divulge the information that I had supplied to them as they decided whether to make the loan or not.  Businesses almost never divulge their financial growth strategies because they do not want competitors copying their methods or strategies. That is not new in the business world. I, as an entrepreneur, did the same since there have been many small startup apparel businesses entering the pickleball space.  Much of the documentation shared with my potential lenders was clearly marked as proprietary.  And I certainly did not want my growth strategy shared with the world of social media as that could have caused harm to the business in many ways.

17. Because of the amount of email storage needed for 20+ years worth of emails, I will not be able to provide every email sent to every plaintiff, but I will have many, and more than enough to ask and plea that this court deny the plaintiff's complaint.

18. Defendant has never denied that he owed loaned money to Plaintiffs and has cooperated completely with the court, the Trustee and all government agencies who have asked for information.  There have been no charges filed.

19. Defendant has shown how he has openly conducted his personal businesses over the last 20+ years, disproving all plaintiffs' allegations of lies or fraud.

## RE: Count I: Non-Dischargeability Under 11 U.S.C. § 523(a)(2)

Defendant denies using false pretenses, false representations and fraud to obtain money from the Plaintiffs.  Plaintiffs loaned money to Defendant based on truthful and factual information at the time of the loan.

## Count II: Non-Dischargeability Under Section 523(a)(4)

Defendant denies engaging in fraud in borrowing money from the Plaintiffs. Since there was no fraud, debt associated with bankruptcy case 23-05593 is dischargeable.

## Count III: Non-Dischargeability Under Section 523(a)(6)

Defendant denies malice was ever present when Plaintiffs decided to loan the Defendant money. Since there was no malice, all debt associated with bankruptcy case 23-05593 is dischargeable.

## Count IV: Non-Dischargeability Under Section 523(a)(19)

Defendant denies deceit and manipulation was used in connection with the Plaintiffs making personal loans to the Defendant.  Defendant asserts and is affirmed by a 2011 Indiana Securities Division inquiry and deposition, that the loans were not registered securities, but personal loans to the Defendant.  Since the loans were not for registered securities, the debt associated with bankruptcy case 23-05593 is dischargeable.

**WHEREFORE,** Defendant respectfully requests that the Court enter judgement in the Defendant's favor and for such other relief as to which it may be entitled.

Respectfully submitted,

Rodney Grubbs – Pro Se Debtor
316 East 11ᵗʰ Street
Brookville, IN 47012

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on Tuesday October 1, 2024 a true copy of the foregoing was hand delivered to the bankruptcy court's clerk's office at 46 E. Ohio Street, Room 116 in Indianapolis, IN 46206. In addition, a copy of the foregoing has been sent by certified US Mail to Attorney Matthew Foster at Foster Law, LLC, 9511 Angola Court, Suite 310, Indianapolis, IN 46268.

Rodney Grubbs, Pro Se Debtor / Defendant