# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

IN RE:                                             )
                                                   )
RODNEY GRUBBS,                                     )          Case No. 23-05593-JJG-7A
                          Debtor.                  )
                                                   )
_____           )
                                                   )
CONNIE ADAMS, MARK ADAMS, SANJIV                   )
AGGARWAL, TERESA AMICK, LARRY AMICK,               )
WAYNE AMRHEIN, LYNNE AMRHEIN, DIANE                )
AZAR, PETER BASSEL, RUTH BAUERLE, ROBERT           )
BAUERLE, SANDRA M. BECKETT, KATHRYN                )
BIARKIS, ROBERT BIARKIS, MARCO BIGGS, JOE          )
BISCHOFF, DORIS BISCHOFF, GARY BISCHOFF,           )
GLEN R. BISCHOFF, TINA BISCHOFF, SUSAN             )
BORREGO, DENISE BOUTIN, JILL BRACK,                )
ABIGAIL BRANDENBERGER, BETTY                       )
BRANDENBERGER, JON BRANDENBERGER,                  )
MATTHEW J. BRANDENBERGER, JENNIFER                 )
BUTLER, CAROL CAPION, HELEN CARLSON,               )
RICHARD CARLSON, APRIL CARPENTER,                  )
RAYMOND CARPENTER, MICHAEL KEVIN                   )
CARVER, JULIE CARVER, MICHAEL C. CHAPIN,           )          Adversary No. 24-50097
VIRGINIA B. CHETTA, GREGORY E. CHETTA,             )
WILLIAM CIFERRI, CATHY CIFERRI, ELDONNA            )
COATS, MICHAEL COATS, STEPHEN COLE, JEFF           )
CONRADI, THOMAS COONEY, JANA S. CORBIN,            )
DOUGLAS C. CORBIN, MICHAEL CRABTREE,               )
SANDRA CRABTREE, KEN CURRY, PATTY                  )
CURRY, MARK A. DALY, DIANA M. DALY, ROB            )
DAVIDSON, SHONDA DAVIDSON, TERESA L.               )
DEAKIN, BONNIE DEAN, RUDOLPH DEAN,                 )
REBECCA L. DEHENNIS, ANDREW C.                     )
DEHENNIS, CHERILYN DRAKE, LESLIE DRAKE,            )
JANICE S. DUPRE, GARY W. DUPRE, SANDY              )
EINHAUS, JOHN EINHAUS, DANIEL                      )
ELLSWORTH, ANDREW EVANS, PATRICIA                  )
GALLEGOS, AARON GARZA, DARIO GARZA, JOE            )
HUNTER GILMORE, CAROLINE GILMORE,                  )
GRACE RITZMAN REVOCABLE TRUST, BRENDA              )
GREEN, FRANCIS GREEN, RICHARD J.                   )
GRIFFITH, MARY ELLYN GRIFFITH, KELLI               )
GRIMES, GREG L. GRIMES, GERALDINE L.               )
GRODZINSKY, GEORGE C. GROSS, JR., SHARON           )

L. GUINGRICH, JOHN GULLO, CRAIG HALEY,                    )
PAULA J. HANDRUP, JACK HANDY, LYNN                        )
HANDY, MARILYN HASLUP, THOMAS HASLUP,                     )
MARILYN HEDRICK, JEAN MARIE HEFFRON,                      )
TIMOTHY PAUL HEFFRON, SUSAN                               )
HENDERSON, TERRY HENDERSON, KEITH                         )
HENSEL, RONALD HENSEL, GREG HILLIGOSS,                    )
PAM HILLIGOSS, DAVID HITESHEW, MARY                       )
HITESHEW, MARILYN JEAN HOLLADAY,                          )
KAREN J. HONEYCUTT, LARRY L HONEYCUTT,                    )
ROBERTA S. HOOKER, WALTER C HOOKER,                       )
RICHARD HORNBUCKLE, LORNA                                 )
HORNBUCKLE, KEVIN HUFF, ERIC HURST,                       )
SANDI HURST, CARLA LYNN INGRAM, KEVIN                     )
INGVALSON, ANDREA INGVALSON, GRACE                        )
JAWORSKY, LISA KARSTEN, EDWARD A.                         )
KARSTEN JR, ROBERT MARK KELLAM, JOAN                      )
FRANCIS KELLAM, DAVE KERSEY, CRAIG KING,                  )
JANE A. KING, ERIC KINGSLEY, KATHERINE                    )
KINGSLEY, JASON KORNREICH, SHAWN                          )
KORNREICH, EVELYNE KORNREICH, ELLIOT                      )
KORNREICH, JAMIE WILLHELM KOVATCH,                        )
DENISE KRAMER-COLE, RACHAEL KROOG,                        )
VIRGIL KUNKEL, BERNADINE KUNKEL,                          )
SHARON KVISTAD, WILLIAM KVISTAD, PENNY                    )
LAKOFF, TIM LAKOFF, AARON LAMPORT,                        )
CAROL LAMPORT, NANCY LAMPORT, NORMA                       )
LAMPORT, KYLE LARAMIE, RACHEL LARAMIE,                    )
BARB LEFFINGWELL, JULIANA LEHMAN,                         )
RICHARD LEHMAN, ANDY LEIGHTON, RANDI                      )
LEVENBAUM, BRANCH R. LEW, MARCIA E.                       )
LEW, ROBERTA B. LITTLE, HEIDI LOUIS,                      )
GERALD LOUIS, JACK LOVINS, SUE LOVINS,                    )
JUDITH A. MAHURON, STEPHEN L. MAHURON,                    )
JAMES MARINO, LEONA S. MARINO, LEONARD                    )
B. MARINO, JEFF MATHEWS, ROBERT                           )
MCCARTHY, LEVI MCCASHLAND, CORINNE                        )
MCCRAY, STEPHANIE MCDONALD, JEANINNE                      )
MCKINNA, DAN MCLAUGHLIN, KATHLEEN                         )
MCLAUGHLIN, CHARLES A. MITCHELL,                          )
FLORIN MOLNAR, MARTHA MULLIN, KEVIN                       )
MURPHY, JANE MURPHY, MICHAEL MURPHY,                      )
CLARK E. NEAL, KAREN NIEDENTHAL, KAREN                    )
S. O'HARE, RANDALL S. O'HARE, CHARLES                     )
OGLESBY, LORETTA OGLESBY, ERIN                            )
OVERHOLT, RYAN OVERHOLT, KENNETH                          )
PALMER, SANDRA PALMER, GUY PASELA,                        )
MARIAN PASELA, LARRY PECK, DEBBIE PECK,                   )

PHIL PICHE, SHANNON PIERCE, RONALD                )
PONDER LIVING TRUST, PETER POPOVICH,              )
VIRGINIA POPOVICH, DIRK PRUIS, DAN                )
PURCELL, STACY PURCELL, DONALD QUIRION,           )
LINDA QUIRION, PATRICIA A. RATHBURN,              )
KEVIN M. REED, CHRISTOPHER REISERT,               )
EMILY REISERT, ANNE RHEINS, TODD RHEINS,          )
SHARON RICHARD, RAYWOOD RICHARD,                  )
DEBORAH ANN RICHTER, ROBERT E                     )
ROMAGOSA, IRENE ROMAGOSA, MARY                    )
SACKSTEDER, SCOTT SCHIRMER, DALE F.               )
SCHNARR, TERI L. SCHNARR, MICHAEL                 )
SCHWEGMAN, AMANDA SCHWEGMAN,                      )
KATHY SHELLY, SCOTT SIEWERT, TERI                 )
SIEWERT, CHERYL SILVERMAN, LAWRENCE               )
SILVERMAN, DALE SLOAN, ROBERT SMUTKA,             )
ST. LOUIS PICKLEBALL LLC, SHERRI                  )
STEINHAUER, KAROLYN STIPECK, BETTY                )
SULLIVAN, GEORGE SUNDRUP, GEORGE                  )
SUNDRUP, MIKE TAFELSKI, PATRICK                   )
TAFELSKI, RITA TAFELSKI, SHAUNNA                  )
TAFELSKI, CHIEN TANG, STEVEN G TAYLOR,            )
FRED THOMPSON, IAN TITUS, BYNUM TUTTLE            )
JR., ROBERT M UNETICH, POLLY UNGER, JOHN          )
URBAN, JANET URBAN, ALAN VOHS, JACKIE             )
VOHS, BETTESUE WACHHOLZ, JOHN R                   )
WACHHOLZ, SHANE WATSON, HOWARD                    )
WEISBART, BRYAN WENTZ, BILL WERNER,               )
EMMA WERNER, PATRICK V. WHELAN, PATTY             )
ANN WHELAN, HELEN WHITE, NANCY                    )
WHITEMAN, ANNETTE WILLHELM, DAVID                 )
WILLHELM, WILLHELM BROTHERS FARMS                 )
LLC, CAROL RENE WILSON, WILSON'S GAME             )
ON, LLC, ELLEN BEATRICE WINDJACK, JAYSON          )
WINDJACK, GREG WOODSUM, and MELODY                )
WOODSUM,                                          )
                                                  )
                    Plaintiffs,                   )
                                                  )
          v.                                      )
                                                  )
RODNEY GRUBBS,                                    )
                                                  )
                    Defendant.                    )


**AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT
PURSUANT TO 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), AND 523(a)(19)**

3

**AMENDED COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**
**PURSUANT TO 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), AND 523(a)(19)**

Plaintiffs, by counsel, object to the discharge of any debts owed to any of them by Rodney Grubbs ("Debtor" or "Grubbs"), and for their "Complaint to Determine Non-Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6) and 523(a)(19)" ("Complaint") state as follows:

### JURISDICTION AND PARTIES

1.      This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b). Each Plaintiff consents to entry of final orders and judgment by the bankruptcy court.

2.      Defendant is Debtor in a case under Chapter 7 of Title 11 of the United States Code. The case started with an involuntary petition filed December 17, 2023 and is now pending in this Court as Case No. 23-05593.

3.      Each Plaintiff is an unsecured creditor of the Debtor who has filed a claim in this case.

4.      This action is an adversary proceeding pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6) to determine the non-dischargeability of certain indebtedness of Debtor to Plaintiffs.

### JOINDER

5.      Joinder of the Plaintiffs is proper. Fed. R. Bankr. P. 7020 and Fed. R. Civ. P. 20 provide that persons "may join in one action as plaintiffs" if their claims meet two criteria: (a) they seek joint, several, or alternative remedies "arising out of the same transaction, occurrence, or series of transactions or occurrences; and (b) "any question of law or fact common to all plaintiffs" – even if it is just one – "will arise in the action."

6.      Rule 20 joinder permits a court to "entertain" the "broadest possible scope of action consistent with fairness to the parties," so "joinder of claims, parties and remedies is strongly encouraged."[1] Liberal joinder "promote[s] convenience and judicial economy,"[2] increases "trial convenience," and "expedite[s] the final determination of disputes, thereby preventing unnecessary multiple lawsuits."[3]

7.      Plaintiffs meet the first criterion of Rule 20 because their claims all arise out of the same "series of transactions or occurrences," i.e., Grubbs' fraudulent Ponzi scheme (discussed in more detail below).  "A 'series of transactions or occurrences' is defined 'not so much upon the immediateness of their connection as upon their logical relationship.'"[4] Thus, a group of plaintiffs' claims that are "predicated on different transactions and occurrences, allegations of fraud and misrepresentation" can "constitute a transaction or series of transactions under Rule 20(a) when they are part of a common scheme."[5]

8.      Plaintiffs' claims arise from the same "series of transactions or occurrences," because all were injured as part of the same "widespread scheme of wrongdoing."[6] Plaintiffs' claims are

---

[1] United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).

[2] Malibu Media, LLC v. Doe, No. 1:12-CV-263, at 10 (N.D. Ind. Dec 03, 2012) (citations omitted).

[3] Bailey v. N. Trust Co., 196 F.R.D. 513, 515 (N.D. Ill. 2000); see David v. Signal Int'l, LLC, Nos. 08-1220 and 12-557, at 5 (E.D. La. Jun 11, 2013) (allowing joinder of multiple plaintiffs because, if severed, "the individual plaintiffs' cases [will] become hopelessly mired in inefficiency, redundance, and delay," and "would surely result in prejudice to the plaintiffs."

[4] Mary Doe and Nancy Roe v. Purdue Univ., No. 4:18-CV-89-JEM, at 7 (N.D. Ind. Mar 25, 2019) (allowing joinder of plaintiffs with "unrelated incidents," even though "there is no 'immediate connection' between the facts of the underlying investigations," because "there is a 'logical relationship' between the occurrences giving rise to the claims").

[5] McAfee v. Francis, No.: 11-CV-00821-LHK, at 6-7 (N.D. Cal. Mar 06, 2012) joinder of plaintiffs was proper because "Plaintiffs' claims ... are grounded in the common scheme alleged to be Defendant Spell's Ponzi scheme, and therefore arise from the same series of transactions or occurrences.")

[6] Zazzali v. 1031 Exch. Grp. LLC (In re DBSI, Inc.), 476 B.R. 413, (Bankr. Del. 2012) (holding it "sufficient" for joinder where it was "alleged that Debtors were engaged in a Ponzi scheme and that the Transfers were made in furtherance of the overall fraudulent scheme")

asserted against a single defendant (Grubbs) who perpetrated a single scheme (the Ponzi scheme) in which Plaintiffs were all similarly victimized, in substantially identical transactions, designed by Grubbs to further his overall scheme. This is more than enough to satisfy Rule 20's first criterion.

9.      Plaintiffs also satisfy Rule 20's second criterion because at least one "question of law or fact common to all plaintiffs" will "arise in the action."[7] As already noted, Plaintiffs' claims are all against one individual (Grubbs), and their "investments" were secured as part of the same scheme. Substantially identical sales pitches and tactics were used by Grubbs with all Plaintiffs. In addition, discovery is likely to show that money invested by some of the Plaintiffs was used to pay off other Plaintiffs, creating additional linkage and commonality that support joinder. There need not be a great or substantial overlap of facts or issues for joinder to be proper. Indeed, "common questions" can exist even if the Plaintiffs allege "different forms" of injury and "different effects."[8]

10.      Joinder of Plaintiffs here is further warranted because of their numerosity and the harm that would result from any severance. Resolving Plaintiffs' very similar claims in one matter, instead of severing them into perhaps 150 different cases or more, plainly serves judicial economy,[9]

---

[7] Peters v. Singh, No. 16-00842-SDD-RLB, at 3 (M.D. La. Nov 06, 2017) (joinder of plaintiffs proper so long as "there is *at least one* common question of law or fact linking all claims") (emphasis added).

[8] Potts v. B&R, LLC, Case No: 8:13-cv-2896-T-27TGW at 7 (M.D. Fla. Apr 21, 2014).

[9] See Bautista-Cruz v. D&K Harvesting, Inc., Case No: 2:15-cv-725-FtM-29CM (M.D. Fla. Jun 14, 2016) (joining six new plaintiffs to numerous filing plaintiffs "promote[d] judicial economy and efficiency by preventing these individuals from filing their own separate action"); Schwarz v. Vills. Charter Sch., Inc., Case No: 5:12-cv-177-Oc-34PRL (M.D. Fla. Oct 17, 2013) (joining numerous additional permissive plaintiffs to dozens of filing plaintiffs was "proper for reasons of judicial economy, the avoidance of multiplicity of suits against Defendants, and the avoidance of inconsistent verdicts"); see also Crichlow v. Del. Dep't of Corrs., Civil Action 22-272-RGA (D. Del. Dec 09, 2022) (approving joinder of 21 filing plaintiffs).

reduces confusion and inefficiency,[10] greatly streamlines discovery, reduces prejudice to all parties, avoids conflicting rulings, and reduces redundant pleadings and proceedings.[11]

## FACTUAL BACKGROUND

11.     For more than twenty years until the end of 2023, Grubbs ran a sinister, fraudulent investment scheme – a "Ponzi" scheme – that ultimately robbed millions of dollars from hundreds of people. Plaintiffs represent a large segment of the victims of Grubbs' scheme.

### Real Estate Phase

12.     For roughly the first ten years of the scheme, i.e., from about 2003 until about 2013, Grubbs lured people to "invest" in a purported enterprise with the stated purpose of buying homes, renovating them, and renting or selling them to generate an unusually high return on the "investments." Grubbs persuaded a number of people – starting with his family and neighbors in Brookville, Indiana – to invest varying amounts of money for the explicit and sole purpose of funding his purchase and renovation of those homes.

13.     Grubbs' pitch to each investor followed the same pattern. Grubbs would tell the investor that he had six investor "slots" for his real estate enterprise and only one "slot" remained open, or had become open due to the exit of another investor. These statements were lies. In fact,

---

[10] David v. Signal Int'l, LLC, Nos. 08-1220 and 12-557, at 5 (E.D. La. Jun 11, 2013) (allowing joinder of numerous plaintiffs in one case because, if severed, "the individual plaintiffs' cases [will] become hopelessly mired in inefficiency, redundance, and delay," and "would surely result in prejudice to the plaintiffs."

[11] See Hoffman v. Knoebel, No. 4:14-cv-00012-SEB-TAB, at 3-4 (S.D. Ind. May 06, 2016) (Baker, M.J.) (approving joinder of 5 new plaintiffs to existing 16, because joinder rather than severance "will avoid duplication of efforts, the risk of inconsistent rulings, and relitigation of issues"); see also Najafi v. Pompeo, Case No. 19-cv-05782-KAW, at 6 (N.D. Cal. Dec 05, 2019) (allowing joinder of nearly 50 named plaintiffs); see also Peterson Farm, Inc. v. Something Sweet Acquisition, Inc. (In re Something Sweet Acquisition, Inc.), 21-10992, Adv. Proc. 23-50752 (Bankr. Del. Mar 07, 2024); Haugland v. Eisenstein (In re Eisenstein), 525 B.R. 428, 433 (Bankr. N.D. Ill. 2015) (numerous medical malpractice creditors properly joined as plaintiffs in adversary proceeding); McAfee, supra note 5, at 6-7; De David v. Alaron Trading Corp., 814 F.Supp.2d 822 (N.D. Ill. 2011).

Grubbs had well beyond six investors at all relevant times. Grubbs also continually promised unrealistic rates of return far above going market rates.

14.    Grubbs told all investors during the real estate phase that their money would be used solely to fund his buying, renovating, and selling of homes, and that revenue generated from this business would fund the promised returns on their investments. These statements by Grubbs were lies. Although some of the investor money was used to purchase low quality homes, most of it was used to line Grubbs' pockets and, more importantly, to pay off earlier real estate investors.

<u>Pickleball Phase</u>

15.    Sometime before 2013, Grubbs became very involved with pickleball, a new sport that was rapidly growing in popularity at the time. Grubbs plunged into the sport, playing and teaching pickleball in Brookville and elsewhere and traveling to tournaments around the country.

16.    During roughly this same period, Grubbs started a pickleball apparel and equipment company called "Pickleball Rocks," which was a d/b/a of an entity called "All About Pickleball, LLC" created and solely owned by Grubbs. Grubbs began promoting Pickleball Rocks at dozens of tournaments around the country and through sponsorships of pro players. In a few years Grubbs started claiming that Pickleball Rocks had become the industry leader in pickleball apparel.

17.    In addition to regularly playing, Grubbs routinely bought vendor space to sell and promote Pickleball Rocks apparel and equipment at tournaments around the country. Through Pickleball Rocks, playing, traveling to tournaments, and even starting a YouTube channel, Grubbs (who calls himself "Rocket") became a well-known personality in the national pickleball community. Grubbs projected a sense of pickleball expertise with a folksy and down-home demeanor, and generated trust with hundreds of pickleball players and enthusiasts.

18.    Grubbs continued his Ponzi scheme after moving into pickleball, but shifted the scheme's focus from purported real estate investment to purported "investment" in Pickleball Rocks. Grubbs primarily targeted pickleball players as new "investors" in his enterprise, using the same sales pitch and methods he had used for the real estate phase of his scheme and, again, promising unrealistically high rates of return. This change of focus proved quite successful and generated millions of new "investment" dollars for Grubbs over the next decade.

19.    Grubbs' pitch to Pickleball Rocks "investors" follow the same pattern he used in the real estate phase. Grubbs would tell the investor that he had six investor "slots" for Pickleball Rocks and only one "slot" remained open, or had become open due to the exit of another investor. These statements were lies. In fact, Grubbs had many, many more than six "investors" in Pickleball Rocks at all relevant times. Grubbs also continued promising unrealistic rates of return far above going market rates.

20.    Grubbs told all investors that their money would be used solely to fund Pickleball Rocks purchases and operations, and said that revenue generated by the company would fund the promised returns on their investments. These statements by Grubbs were lies. Although a small amount of the investor money was used by or for Pickleball Rocks, nearly all of it was used instead to line Grubbs' pockets and, more importantly, to pay off earlier pickleball investors.

<u>Facts Common to All Plaintiffs and Entire Scheme</u>

21.    Grubbs' investment scheme, from its real estate phase through its pickleball phase, was a "Ponzi" scheme, "in which funds obtained from new investors," with promises of unusually high returns, "are used to satisfy interest and principal obligations due on earlier investors' notes

(and usually to line the pockets of the scheme's perpetrators). Such a scheme requires an ever-larger circle of new investors to keep it afloat, and thus almost invariably ends in disaster."[12]

22.     All of Grubbs' Ponzi scheme victims (his "marks") were defrauded the same way and as part of the same scheme as described above. Once into his pitch, Grubbs used high-pressure tactics to secure the money, emphasizing that the investors could not miss this great opportunity, and that the investment was critical to the success of the enterprise at the time (real estate or Pickleball Rocks).

23.     Grubbs always insisted that new investors tell no one else about their investments with him, ostensibly because others not approached might be jealous about the missed investment opportunity, and because confidentiality was best served if no investor knew the identity of any other investor, or words to that effect. In fact, Grubbs needed total secrecy to keep his fraudulent scheme from being discovered. This veil of silence enabled Grubbs to continue taking money from larger and larger numbers of people, and to state falsely that each investor was a member of a very small and exclusive six-person investment group.

24.     Grubbs' methods for taking his victims' money and documenting their "investments" never changed. An investor agreed to pay Grubbs a stated amount, usually by wire transfer to a bank account owned and controlled by Grubbs. In exchange, Grubbs gave each investor a very basic, short-term personal promissory note for the investment amount. These notes were extremely similar for all investors and contained identical boilerplate language. The notes typically had terms between 6 and 18 months and promised annual returns ranging from 10% to 21%.

25.     Every dollar Grubbs secured from an investment victim went into his own bank accounts. From there, some small portion of the "investment" might find its way to the target

---

[12] <u>Harrison v. Dean Witter Reynolds, Inc.</u>, 79 F.3d 609, 613 n.3 (7th Cir. 1996).

enterprise (real estate or Pickleball Rocks), but – particularly in and after 2016 – all or nearly all of the new money was used to pay earlier investors a false "return." Grubbs also lined his own pockets with investor money and, in 2022, used investor money to fund scholarships at his alma mater.

26.    Grubbs never paid the vast majority of his promissory notes. Typically, when a note matured Grubbs would convince the investor to "roll it over," meaning the investment – on paper but not in actual funds – would continue to grow in value. When an investor did not want to "roll it over" any longer, but instead desired to cash out, Grubbs on rare occasions would pay the accrued debt (from later-acquired investment funds). Far more commonly, however, Grubbs would irregularly pay small portions of what he owed, invent excuses for delaying or stopping payments, and then ultimately cut off contact with the investor.

27.    Frequently during his scheme, Grubbs openly admitted that he was soliciting and using new investor money to pay and repay earlier investors. These admissions prove that Grubbs was running a Ponzi scheme, and directly contradicted his statements about how investment funds would purportedly be used.

28.    All "investor" transactions initiated by Grubbs, and all of his actions related to or connected with those transactions (including receipt, deposits, transfers, and payment of funds, communications, and documentation), were in furtherance of Grubbs' fraudulent Ponzi scheme.

<u>Grubbs' Security Violations and the Cease and Desist Order</u>

29.    In December 2023, based on information received from certain Plaintiffs herein and others, the Indiana Secretary of State's Securities Division (the "Securities Division") started investigating Grubbs' years-long investment scheme. By early January 2024, the Securities Division concluded that Grubbs' scheme, and all transactions made as part of it, constituted securities fraud

in violation of I.C. § 23-19-5-1, and the offering or selling unregistered and nonexempt securities in violation of I.C. § 23-19-3-1.

30.     On January 12, 2024, the Securities Division entered a "Cease and Desist Order" (the CD "Order") against Grubbs, which granted and incorporated a "Petition for Cease and Desist Order" (the "CD Petition") submitted the same day. The CD Order was not appealed and therefore became final on February 26, 2024. (True and correct copies of the CD Order and the CD Petition are attached as Exhibit A, and the entire contents of both are incorporated as though fully restated herein.)

31.     The CD Order, among other things, forbids Grubbs from committing further violations of Indiana securities law and assessed large fines for his illegal conduct. The CD Order and CD Petition also confirmed key facts alleged by Plaintiffs in this case, e.g., that Grubbs used the same "one last available slot" pitch with every investor, admitted "need[ing] more investment so they can pay back prior investors" (the Ponzi scheme), and made "excuses for [his] non-payment" of promissory notes "before he eventually stopped responding" altogether.

## COUNT I
## NON-DISCHARGEABILITY FOR FRAUD [11 U.S.C. § 523(a)(2)]

32.     All foregoing paragraphs are incorporated as though fully restated herein.

33.     Debtor exploited all the Plaintiffs through his Ponzi scheme and improperly took their money through fraud, false pretenses, and false representations.

34.     Debtor's Ponzi scheme constitutes actual fraud under 11 U.S.C. § 523(a)(2)(A). Fraud under § 523(a)(2) "has long [been] held" "to encompass fraudulent conveyance schemes"[13]

---

[13] Husky Int'l Elecs., Inc. v. Daniel Lee Ritz, 136 S. Ct. 1581, 1590 (2016).

such as Ponzi schemes. Moreover, any asset transfer scheme used by a debtor to hinder a creditor's ability to collect a debt, including a Ponzi scheme, constitutes "fraud" for purposes of § 523(a)(2).[14]

35.    The totality of circumstances show that when Grubbs incurred his debts to the Plaintiffs, he did not intend or plan to repay them.

36.    Plaintiffs reasonably and justifiably relied on Debtor's fraud, false representations, and other misconduct in lending money to Debtor.

37.    In the absence of Debtor's fraud, false representations, and other misconduct, none of the Plaintiffs would have loaned money to Debtor.

38.    Debtor's debts to Plaintiffs are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) because of Debtor's fraud, false pretenses, and false representations.

## COUNT II
## NON-DISCHARGEABILITY FOR LARCENY [11 U.S.C. § 523(a)(4)]

39.    All foregoing paragraphs are incorporated as though fully restated herein.

40.    As shown by the facts above, Debtor committed larceny against Plaintiffs through his Ponzi scheme. Debtor misappropriated Plaintiffs' investment funds, and the funds were never repaid.[15]

41.    Debtor's debts to Plaintiffs are non-dischargeable under 11 U.S.C. § 523(a)(4) because of Debtor's larceny.

---

[14] Pergament v. Diamond (In re Diamond), No. 20-71878-reg, Adv. Pro. 20-8175-reg, at 3 (Bankr. E.D. N.Y. Sep 05, 2024) ("a Ponzi scheme … by necessity involves fraud" for purposes of § 523(a)(2); In re Moore, No. 16-33444 (Bankr. S.D. Ohio Apr 11, 2024) (Ponzi scheme constitutes "actual fraud" under § 523(a)(2)).

[15] See Jones v. Prough (In re Prough), No. 23-11665, Adv. Proc. 24-1018, at 6 (Bankr. N.D. Ind. Aug 30, 2024).

### COUNT III
### NON-DISCHARGEABILITY FOR EMBEZZLEMENT [11 U.S.C. § 523(a)(4)]

42.     All foregoing paragraphs are incorporated as though fully restated herein.

43.     As shown by the facts above, Debtor embezzled Plaintiffs' funds through his Ponzi scheme. Plaintiffs entrusted Debtor with their funds for specific purposes; Debtor unlawfully and fraudulently misused those funds for other, unauthorized purposes; and Debtor failed to provide the promised returns or repay the funds to Plaintiffs.[16]

44.     Debtor's debts to Plaintiffs are non-dischargeable under 11 U.S.C. § 523(a)(4) because of Debtor's embezzlement.

### COUNT IV
### NON-DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(6)

45.     All foregoing paragraphs are incorporated as though fully restated herein.

46.     Debtor misappropriated and stole money from Plaintiffs through his Ponzi scheme. Plaintiffs gave funds to Debtor for specific purposes; Debtor unlawfully and fraudulently misused those funds for other, unauthorized purposes; and Debtor failed to provide the promised returns or repay the funds to Plaintiffs.

47.     Debtor's actions toward Plaintiffs were harmful, willful, malicious, injurious, and taken without just cause or excuse.

48.     Debtor knew or was substantially certain his actions would cause severe financial, emotional, and other injuries to Plaintiffs.

49.     Debtor's debts to Plaintiffs are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) because of Debtor's harmful, willful, malicious, injurious, and unexcused actions toward Plaintiffs.

---

[16] See Bank of Am., N.A. v. Armstrong (In re Armstrong), 498 B.R. 229, 234 (B.A.P. 8th Cir. 2013); Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993); Belfry v. Cardozo (In re Belfry), 862 F.2d 661, 662 (8th Cir. 1988).

## COUNT V
## NON-DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(19)

50.    All foregoing paragraphs are incorporated as though fully restated herein.

51.    Debtor's debts to Plaintiffs arise from violations of Indiana state securities laws that occurred during and in furtherance of his Ponzi scheme.

52.    Debtor's debts to Plaintiffs arise from actions recited in an order issued by the Indiana Secretary of State's Securities Division, which order holds Debtor liable and imposes penalties for many violations of Indiana state securities law, as determined and set forth in the CD Order and CD Petition attached and incorporated as Exhibit A.

53.    Debtor's debts to Plaintiffs also arise from common law fraud, deceit, or manipulation in connection with the purchase or sale of any security, as set forth herein and in the CD Order and CD Petition attached and incorporated as Exhibit A.

54.    Debtor's debts to Plaintiffs are non-dischargeable pursuant to 11 U.S.C. § 523(a)(19).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court enter an order and judgment determining that Debtor's debts to the Plaintiffs are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), and/or 523(a)(19), and grant Plaintiffs all other just and appropriate relief.

Respectfully submitted,

/s/ Matthew Foster
Matthew Foster (16400-49)

Foster Law LLC
9511 Angola Court, Suite 310
Indianapolis IN 46268
matt@fosterlaw.llc
317-399-4686 (fax NA)

Attorney for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on October 23, 2024 a true copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties through the Court's Electronic Case Filing System. Parties may access this filing through such system.

<u>/s/ Matthew Foster</u>
Attorney for Plaintiffs

# EXHIBIT A

## STATE OF INDIANA
## OFFICE OF THE SECRETARY OF STATE
### SECURITIES DIVISION

IN THE MATTER OF: )

)

   RODNEY U. GRUBBS )

   and ALL ABOUT PICKLEBALL, LLC )

   DBA "PICKLEBALL ROCKS" )

)    Cause No. 24-0001 CD

     RESPONDENTS. )    **FILED**
                              SECURITIES DIVISION

### CEASE AND DESIST ORDER

**JAN 1 2 2024**

INDIANA
SECRETARY OF STATE

Petitioner, the Office of the Indiana Secretary of State, Securities Division ("Division"),
has filed its Petition for Cease and Desist Order ("Petition") against Rodney U. Grubbs
("Grubbs") and All About Pickleball, LLC DBA "Pickleball Rocks" ("Rocks"), together
"respondents," for violations of the Indiana Uniform Securities Act, I.C. § 23-19 *et seq.*
("IUSA").

Pursuant to I.C. § 23-19-6-4 the Securities Commissioner ("Commissioner") may issue a
cease and desist order without a hearing whenever it appears to the Commissioner upon
investigation, that a person has engaged or is about to engage in an act or a practice constituting
a violation of the IUSA and Rules.

Based on the information presented by the Petition, it appears to the Commissioner that,
respondents have committed securities fraud in violation of I.C. § 23-19-5-1, and respondents
have engaged in the offer and sale of unregistered and nonexempt securities in violation of I.C. §
23-19-3-1.

THE COMMISSIONER THEREFORE ORDERS that respondents immediately Cease
and Desist from engaging in **any** act that violates the IUSA, Indiana Uniform Securities Rules
(710 IAC 4, *et seq.*), and the Commissioner's Administrative Orders. The Commissioner hereby

# EXHIBIT A

determines that this Cease and Desist Order is in the public interest and is necessary for the protection of Indiana investors.

This is an agency action. Pursuant to I.C. § 23-1 9-6-4(b), upon request by a party, this order will be scheduled for a hearing by the Commissioner. Review of this agency action may be initiated by completing and signing the attached "Petition for Hearing" form and either: 1) mailing your form; or 2) hand delivering a completed form to the Indiana Secretary of State, Securities Division located at 302 W. Washington St., Rm E-111 Indianapolis, IN 46204.

This Order is effective upon date of issuance. Pursuant to I.C. § 23-19-6-4(b), if a person subject to this Order requests a hearing in the manner set forth above, the matter will be scheduled for a hearing within fifteen (15) days after receipt of such a request.

If a person subject to this order does not request a hearing within forty-five (45) days after the date of service of the order, and no hearing is otherwise ordered by the Commissioner, the order becomes final by operation of law under I.C. 23-19-6-4(d).

ORDERED at Indianapolis, Indiana, this 12th day of January, 2024.


DIEGO MORALES
SECRETARY OF STATE


MARIE CASTETTER
SECURITIES COMISSIONER

**FILED**
SECURITIES DIVISION

JAN 1 2 2024

INDIANA
SECRETARY OF STATE

**STATE OF INDIANA**
**OFFICE OF THE SECRETARY OF STATE**
**SECURITIES DIVISION**

IN THE MATTER OF:                                    )
                                                     )
    RODNEY U. GRUBBS                           )
    and ALL ABOUT PICKLEBALL, LLC             )
    DBA "PICKLEBALL ROCKS"                    )
                                                     )        Cause No. 24-0001 CD
    RESPONDENTS.                              )

### PETITION FOR CEASE AND DESIST ORDER

Petitioner, the Office of the Indiana Secretary of State, Securities Division ("Division"), files this Petition for Cease and Desist Order ("Petition") against Rodney U. Grubbs ("Grubbs") and All About Pickleball, LLC DBA "Pickleball Rocks" ("Rocks") for violations of the Indiana Uniform Securities Act, I.C. § 23-19 *et seq.* ("IUSA").

This is an enforcement action arising from violations of state securities laws by respondents. Rocks is a pickleball apparel and equipment brand that holds itself out as "**the world's most recognized pickleball apparel brand**." (Emphasis maintained). *Exhibit 1*. Pickleball is a "game . . . [c]ombining elements of tennis, badminton, and ping-pong [that] is played with a paddle and plastic ball similar to a wiffle ball." *Exhibit 2.* According to *TIME*, pickleball is "America's fastest-growing sport" and "more than half (52%) of core players . . . are 55 years or older, and almost a third (32.7%) are 65-plus." *Exhibit 3.* Nevertheless, the "pickleball community" remains relatively close-knit and the sport is popular among an older and wealthier demographic. *Exhibit 4.* In 2008, Grubbs "became a paddle distributor for Pro-Lite Sports" and "in a brainstorming session [in 2009], [sic] came up with the phrase **Pickleball Rocks**." (Emphasis maintained). *Exhibit 1.* On July 24, 2013, Grubbs filed Articles of Organization for Rocks, which is based in Brookville, Indiana. *Exhibit 5.*

Respondents have "traveled the world . . . preaching the pickleball gospel" since, which appears to include the ongoing offer and sale of unregistered and nonexempt promissory notes.

**1** of 19

(Emphasis maintained). *Exhibit 1* at 2. Respondents have solicited investors nationwide, many met through pickleball tournaments where respondents sell their pickleball apparel and equipment. Grubbs has routinely told investors that Rocks has an ever recurrent *one last available slot* to invest at twenty-five-thousand dollars ($25,000.00) and that funds will be used to purchase more inventory. Specifically, "Our goal is to have Pickleball Rocks branded nets, balls, and paddles in every school and college system in the country. We will be able to get better profit margins since we will be buying in larger quantities." *Exhibit 6* at 3.

Respondents' promissory notes, often called "Personal Promissory Notes" ("PPNs"), are neither registered nor exempt from registration. These promissory notes typically guarantee: 1) a twelve percent (12%) interest rate, which is compounded monthly, 2) payment in one lump sum after eighteen (18) months, and 3) eighteen percent (18%) penalty interest should respondents default. Grubbs has routinely encouraged investors to "roll over" their promissory notes by reinvesting their principal and interest into new PPNs. By doing such, respondents have been able to avert repayment. In the "All About Pickleball, LLC Proprietary and Confidential" document ("Memo") provided to potential investors, Grubbs explains that he needs more investment so Rocks can pay back prior investors and continue to grow. *Exhibit 7*. Grubbs has urged investors not to discuss the Memo or exclusive investment opportunity with others. Additionally, Grubbs had at least one investor deposit a portion of their retirement account into a trust account with Equity Trust Company[1], so he could withdraw their funds and issue promissory notes. *Exhibit 8*.

On October 13, 2023, Indiana investors J.M. and M.M. filed suit against Grubbs, in his individual capacity, out of the Franklin Circuit Court, under cause number 24C02-2310-PL-000565. *Exhibit 9*. On November 27, 2023, an Entry of Default Judgment was entered against Grubbs with damages of four-million-nine-hundred-seventy-four-thousand-two-hundred-seventeen dollars and eighty-eight cents ($4,974,217.88) due to Grubb's failure to repay on J.M. and M.M.'s fourteen (14) promissory notes "for the purpose of investing in [his] purported real estate business." *Exhibits 10* and *9* at 2, respectively. On August 1, 2023, North Carolina investors L.P. and D.P. filed suit against Grubbs, in his individual capacity, out of the Franklin Circuit Court, under cause number 24C02-2307-CC-000400. *Exhibit 11*. Grubbs had executed a

---

[1] Equity Trust Company ("ETC") is a self-directed IRA custodian, which has been used to perpetuate securities fraud. See: Securities and Exchange Commission Admin. Proceeding File No. 3-16594.

Promissory Note with L.P. and D.P. in the "principal amount of . . . $430,133.05 – much of which represents [their] retirement money – "plus interest of Fourteen Percent (14%) APR." . . . [payable] "on or before August 18, 2022" . . . The total amount owed on the Note for principal and interest as of August 18, 2022[,] is no less than $559,000.91, not including prejudgment interest." *Id.* at 1.  On December 20, 2023, an Order and Entry of Default Judgment was entered against Grubbs and a restitution order remains pending. *Exhibits 12* and *13*, respectively. Grubbs also has a pending lawsuit related to his "purported real estate business," filed under cause number 24C01-2311-CT-000631, which alleges that one-million-two-hundred-sixty-five-thousand-seven-hundred-forty-four dollars and sixteen cents ($1,265,744.16) is owed to Indiana investor P.P., who invested with Grubbs over six (6) promissory notes. *Exhibit 14* at 2.

On December 17, 2023, some aggrieved investors filed a Chapter 7 "Involuntary Petition Against an Individual" against Grubbs, which remains pending before the U.S. Bankruptcy Court of the Southern District of Indiana, under cause number 23-05593-RLM-7. *Exhibit 15.* That same day, Grubbs notified one investor that "I have been working with attorneys the last three days and I cannot talk about anything that is going on right now . . . All payments are being halted for now . . . my bank accounts are empty." *Exhibit 16* at 1.  Beyond the various lawsuits, respondents have defaulted on several promissory notes with Indiana investors who have failed to receive agreed upon returns from Rocks.

## II. JURISDICTION AND AUTHORITY

1. The Division is part of the Office of the Indiana Secretary of State with jurisdiction over matters relating to securities, as provided by the IUSA.

2. The Division brings this action pursuant to the authority conferred upon it by I.C. § 23-19-6-4 wherein the Securities Commissioner ("Commissioner") has the authority to conduct a hearing to enforce the provisions of the IUSA and all Rules promulgated thereunder (710 IAC 4 *et seq.*).

3. The acts and practices constituting violations of the IUSA as alleged herein occurred in Indiana.

4. The Division reserves all rights to amend this Petition for Cease and Desist Order and/or file an Administrative Complaint to reflect information developed in an ongoing investigation.

### III.   RESPONDENTS

*Rodney U. Grubbs*

5.   Rodney U. Grubbs is the CEO of All About Pickleball, LLC.

6.   Grubbs also goes by the nickname "Rocket."

7.   On July 24, 2013, Grubbs filed the Articles of Organization for All About Pickleball, LLC DBA "Pickleball Rocks" with the Office of the Indiana Secretary of State, Business Services Division ("BSD"). *Exhibit 5*.

8.   Grubbs maintains the website "www.rodneygrubbs.com".

9.   Pursuant to the "Rodney Grubbs Mission and Vision" webpage on that site, Grubbs' mission is "To coach individuals and married couples to make decisions and take actions that will improve their personal, professional, and financial wellbeing." *Exhibit 17*.

10.  To that effect, Grubbs holds himself out as a "Certified Cash Flow Consultant" and "Certified Professional Consultant." *Exhibit 18* at 2.

11.  Grubbs also maintains the website "www.newlevelconsulting.com".

12.  According to the "Testimonials" posted on that site, Grubbs has trained multiple people living "paycheck to paycheck" to become "very successful," by means such as purchasing real estate "with no money down." *Exhibit 19*.

13.  Pursuant to a search conducted through the Indiana Professional Licensing Agency, Grubbs has never held a license with the Real Estate Commission. *Exhibit 20*.

14.  On April 15, 2009, Grubbs filed Articles of Organization for "Your Business Ignited LLC" (DBA "Ignited," "My Neighborhood Team," and "Tasty Legends") with the BSD. *Exhibit 21*.

15.  On May 8, 2023, Grubbs filed a Business Entity Report for Ignited with the BSD, which lists him as its CEO, President, and Registered Agent. *Exhibit 22*.

16.  Grubbs also maintains "www.neverendinghoneymoon.com," the website for "Sharing and Caring For Your Marriage" and "www.helpingpeopleup.com," the website for "Helping you get a flood of customers while drastically decreasing your advertising costs. NOTHING TO IT!" *Exhibits 23* and *24*, respectively.

17.  Grubbs resides in Brookville, Indiana.

*All About Pickleball, LLC DBA "Pickleball Rocks"*

18.   All About Pickleball, LLC, DBA "Pickleball Rocks" is an Indiana Limited Liability Company.

19.   Rocks was formed on July 24, 2013, after Grubbs filed its Articles of Organization with the Office of the Indiana Secretary of State, Business Services Division. *Exhibit 5.*

20.   On May 8, 2023, Grubbs filed a Business Entity Report with the BSD, which lists him as Rocks' CEO. *Exhibit 25.*

21.   Rocks also employs other members of the Grubbs' family, including Zachary Grubbs, Josh Grubbs, and Abby Grubbs. *Exhibit 7 at 1.*

22.   Rocks has sold its pickleball apparel and equipment pickleball tournaments nationwide for several years.

23.   Rocks is also an online retailer of pickleball apparel and equipment.

24.   The website domain addresses "www.helpingpickleballgrow.com"; "www.pickleballrocks.com"; and "www.pickleballshopping.com" are all affiliated with Rocks and redirect to the same retail website. *Exhibit 26* at 3.

25.   Additionally, respondents maintain "www.pickleballchristmas.com"; "www.pickleballshopping.com"; "www.pickleballvideos.net"; "www.whatispickleball.com"; "www.pickleballchampionsclub.com"; "www.pickleballclubwear.com"; "www.nominateaplayer.com"; "www.nominateafacility.com"; "www.nominateaclub.com"; "www.pickleballmile.com"; "www.pickleballfoundation.com"; "www.pickleballrules.com"; and "www.pickleball.com". *Id.*

26.   According to its Privacy Policy posted online, "**Pickleball Rocks is a registered trademark** owned by Your Business IGNITED, LLC, a Grubbs family company which also owns All About Pickleball, LLC." (Emphasis maintained). *Exhibit 27* at 1.

27.   Around November 2022, Rocks opened a retail store at 110 Main Street, Brookville, Indiana, 47012.

28.   The retail store's contact information, location, and hours are omitted from Rocks' website(s), aside from a blog post from November 16, 2022. *Exhibit 28.*

29.    Rocks maintains a principal office address of 316 East 11th Street, Brookville, Indiana 47012. *Exhibit 25.*

## IV.    FACTS

*Respondents Are Neither Registered Nor Exempt*

30.    Rocks sells pickleball apparel and equipment.

31.    Rocks sells its products: 1) at pickleball tournaments, 2) online, and 3) at its retail storefront.

32.    Grubbs has offered and sold securities in Rocks.

33.    Grubbs has not registered with the Division in any capacity.

34.    Rocks has not registered with the Division in any capacity.

35.    Respondents have not filed a Form D with the Securities and Exchange Commission for a federally covered offering.

36.    Respondents have not claimed a state exemption from registration.

*Respondents' Ongoing Offer of Promissory Notes*

37.    Since no later than January 2013, Rocks has issued at least one (1) "Pickleball Rocks Domination Plan" ("Domination Plan"), which is "Updated: Constantly!," and "Proprietary and Confidential." *Exhibit 26.*

38.    The eighty-nine (89) page Domination Plan issued in 2022 pitches different pickleball-related business opportunities with respect to social media, tournaments, brand expansion, shirt ideas, marketing, targeting educational institutions, etc. *Id.*

39.    The Domination Plan also proposes international expansion with "Pickleball Rocks Japan," "Pickleball Rocks India," "Pickleball Rocks Europe," and "Pickleball Rocks Canada." *Id.* at 37.

40.    The Domination Plan has been provided to investors as part of respondents' solicitation efforts.

41.    Grubbs has told prospective investors that up until 2020, Rocks' "apparel was being sold at 4-5 tournaments somewhere in the country every weekend." *Exhibit 6* at 2.

42.    Grubbs has also told investors that Rocks suffered significant losses around 2020 even though "a million new players" began playing pickleball during the pandemic. *Id.; Exhibit 29* at 2.

43.   According to Grubbs, "To those new people, buying clothing was not a necessity" but "the paddle companies had record sales." *Exhibits 6* at 3 and *29* at 2.

44.   In turn, Grubbs told several investors that Rocks aimed to purchase large quantities of "low cost paddles," "obsolete or overstocked low-end paddles," and "banned paddles" for resale to clients including "schools and colleges." *Exhibit 6* at 4.

45.   Grubbs also told several investors that Rocks needed to buy more pickleball equipment inventory and that their investments would be used for that limited purpose.

46.   As part of their solicitation efforts, respondents have issued and distributed an "All About Pickleball, LLC Proprietary and Confidential" document ("Memo"). *Exhibit 7.*

47.   The same Memo has been provided to several different investors.

48.   The Memo states that respondents "made the decision to begin growing [their] inventory by raising $150,000 [in] seed capital" provided by "4 close pickleball families[2]." *Id.* at 4.

49.   The Memo also states that the initial one-hundred-fifty-thousand dollars ($150,000.00) was provided through six (6) separate twenty-five-thousand dollar ($25,000.00) investments. *Id.*

50.   Respondents "agreed to pay [investors] a 12% APR with monthly compounded interest on these 25K *loans[3]* for 18 months at a time." (Emphasis added). *Id.*

51.   According to the Memo, these investors "generally take interest checks every 18 months or they choose to roll their interest and principal together to grow for another 18 months" instead of seeking full repayment on their promissory notes. *Id.*

52.   However, the Memo states that one investor prominent in the pickleball community ("prominent investor") "decided to cash out [their] slot," their "payoff has already been wired to [them]," and that former investor "would be happy to talk to anyone considering taking [their] s[l]ot." *Id.*

---

[2] Grubbs frequently refers to Rocks as a family company; it also appears that pickleball is a "family affair" for some.
[3] The "loans" are in fact the aforementioned promissory notes.

53.  The Memo further states that when the prominent investor cashed out, the "income was not available" to pay them back and respondents were not "able to support this payout and still have the needed capital to grow." *Id.*

54.  Accordingly, respondents "have a need to replace the 25K slot from this lost investor family" and have been looking for an investor to fill the *one last available slot*. *Id.*

55.  The Memo opines that "[Grubb's] family has a great nine year track record" and that an investment with respondents is "a very safe bet." *Id.*

56.  The same Memo has been provided to several investors, each of whom have been told they can fill the *one last available slot*.

57.  Furthermore, respondents have urged prospective investors to not discuss this exclusive investment opportunity with anyone else.

58.  In at least one instance, Grubbs stressed the limited window for investment, telling an investor "**We will need to raise this money by mid next week**." (Emphasis maintained). *Exhibit 6 at 4.*

*Respondents' Ongoing Sale of Promissory Notes*

59.  Respondents have continued to sell promissory notes in Rocks, including a PPN dated October 19, 2023. *Exhibit 30.*

60.  Respondents have sold promissory notes to investors with 1) their *one last available slot* pitch described in the Memo, and/or 2) their pickleball equipment inventory purchase pitch.

61.  Respondents have obtained investment from several investors through the aforementioned scheme although they have failed to fully repay on any of the related promissory notes.

62.  Respondents have issued unregistered and nonexempt promissory notes totaling no less than four-hundred-ten-thousand-seven-hundred-twenty-five-dollars and sixty cents ($410,725.60).

*Investor H.W.*

63.  Investor H.W. resides in Illinois.

64.  H.W. met Grubbs through the pickleball community.

65.  H.W. invested twenty-five-thousand dollars ($25,000.00) from their retirement account into Rocks through Equity Trust Company ("ETC").

66. H.W. was provided with a "Promissory Note" ("PN") dated January 29, 2020, but notarized January 27, 2020, in Franklin County, Indiana, wherein H.W. invested twenty-five-thousand dollars ($25,000.00) at twelve percent (12%) interest[4], with repayment "in one lump sum, on or before July 29, 2020." *Exhibit 8* at 5.

67. H.W. was also provided with a "Promissory Note DOI" from ETC, reflecting that H.W. would be repaid "one lump sum" of twenty-nine-thousand-nine-hundred-three dollars and sixty-nine cents ($29,903.69) on July 29, 2021, a full year later than what the PN reflects. *Exhibit 8* at 1.

68. Subsequently, H.W. was provided with a "Desk of Rodney Grubbs," letter dated September 19, 2022, which states that "Your IRA rate remains locked at 12% for another 18 months." *Exhibit 31*.

69. H.W. was later provided with a separate "Promissory Note AMENDMENT" dated January 29, 2023, but notarized June 20, 2023, in Franklin County, Indiana, which states "**NEW: Due Date of Promissory Note will be <u>July 29, 2024</u>. Current value of this note is <u>$35,769.22</u> <u>All other terms remain the same</u>.**" *Exhibit 32*.

*Investor S.G.*

70. Investor S.G. resides in Indiana.

71. S.G. met Grubbs through the pickleball community.

72. Grubbs offered S.G. the opportunity to invest in Rocks.

73. On May 21, 2018, Grubbs emailed S.G. that "I will give you a heads up now. Every fall we need a 25-30K loan for 6-8 months. It is used to substantially increase our inventory . . . The loan pays a 14% APR while we have it." *Exhibit 33* at 1.

74. At the time S.G. declined to invest due to financial uncertainty.

75. About three (3) years later, S.G. reached out to Grubbs about investing.

76. Grubbs meet with S.G. and discussed the Domination Plan. *Exhibit 26*.

77. Grubbs told S.G. that an investment with Rocks was "private," so taxes would not need to be paid on the interest.

78. On March 3, 2021, S.G. invested twenty-five-thousand dollars into Rocks.

79. S.G. was provided with a PPN dated March 3, 2021, but notarized April 15, 2021, wherein S.G. invested twenty-five-thousand dollars ($25,000.00) at "**$500 or 12%**

---

[4] Unlike later investments, the interest on this Promissory Note was not compounded.

**(Twelve Percent) APR interest** . . . **compounded monthly**" with repayment "in one lump sum, on or before **9/3/2022**." (Emphasis maintained). *Exhibit 34.*

80.   S.G. was subsequently provided with a PPN dated March 3, 2022, but notarized June 6, 2022, wherein S.G. invested twenty-nine-thousand-eighteen dollars and eighty-six cents ($29,018.86) at "**$500 or 12% (Twelve Percent) APR interest** . . . **compounded monthly**" with repayment "in one lump sum, on or before **3/3/2023**." (Emphasis maintained). *Exhibit 35.*

81.   Grubbs told S.G. that this latter PPN was "rolled over" from her first PPN, even though S.G.'s initial PPN had not yet matured.

82.   On June 27, 2022, S.G. made a final investment of twenty-five-thousand dollars ($25,000.00) into Rocks.

83.   S.G. was provided with a PPN dated June 27, 2022, but notarized July 11, 2022, wherein S.G. invested twenty-five-thousand dollars ($25,000.00) at "**12% (Twelve Percent) APR interest** . . . **compounded monthly**" with repayment "in one lump sum, on or before **12/27/2023**." (Emphasis maintained). *Exhibit 36.*

84.   S.G. had previously told Grubbs that they intended to "roll over" their investments for a span of ten (10) years.

85.   However, after developing concerns about Rocks, they have since sought repayment.

86.   To date, S.G. has not been repaid on either of their investments.

*Investor W.H.*

87.   Investor W.H. resides in Florida.

88.   Around Spring 2021, W.H. met Grubbs at a pickleball tournament.

89.   At that tournament, Grubbs offered W.H. the opportunity to invest in Rocks so it could make pickleball equipment inventory purchases.

90.   Sometime in October 2021, W.H. invested twenty-five-thousand dollars ($25,000.00) in Rocks.

91.   Grubbs told W.H. that W.H. was taking the aforementioned prominent investor's slot.

92.   W.H. was provided with a promissory note that was due for repayment sometime in April 2023.

93.   On August 18, 2022, Grubbs emailed W.H. "it is important right now that we raise some additional capital . . . if you know of anybody that might be a good candidate,

please let me know. Buying these initial paddles and getting them sold is critical to us getting our new equipment side of the business off the ground." *Exhibit 6* at 1.

94. W.H. did not invest additional money into Rocks.

95. When April 2023 came around, Grubbs failed to repay W.H.

96. However, on or about September 23, 2023, Grubbs sent W.H. a check for ten-thousand dollars ($10,000.00). *Exhibit 37* at 4.

97. W.H. deposited the check, which cleared.

98. On November 2, 2023, W.H. emailed Grubbs and requested another check for ten-thousand dollars ($10,000.00). *Id.* at 3.

99. On November 30, 2023, Grubbs told W.H. that he "may be able to get a $10,000 check to you this coming week . . . *I [have] got to make a little bit more money yet* but should be able to make the final payoff by that December 31 date for you." (Emphasis added). *Id.* at 2.

100. W.H. received another check from Grubbs although W.H.'s bank warned them not to deposit the check for "moderate risk" of insufficient funds. *Id.* at 1.

101. On December 12, 2023, and December 13, 2023, W.H. asked Grubbs to wire them the outstanding balance on their promissory note. *Id.*

102. W.H. received no response from Grubbs nor did they receive additional funds.

*Investor A.B.*

103. Investor A.B. resides in Indiana.

104. A.B. learned of Grubbs through the pickleball community.

105. A.B. was approached by Grubbs around April 2021.

106. Grubbs offered A.B. the opportunity to invest in Rocks.

107. Grubbs told A.B. that one of six (6) limited slots for investment had opened up and that he was seeking twenty-five-thousand dollars ($25,000.00) for Rocks.

108. Grubbs promised A.B. a twelve percent (12%) return on investment.

109. Grubbs told A.B. that their funds would only be used to purchase inventory.

110. Around May 2022, A.B. invested twenty-five-thousand dollars ($25,000.00) in Rocks.

111. Grubbs told A.B. they would be repaid by November 24, 2023.

112. Grubbs failed to repay A.B. by November 24, 2023.

113. No later than December 2023, A.B.'s partner M.B. began reaching out to Grubbs about repayment.

114. To date, A.B. has not been repaid.

*Investor B.L.*

115. Investor B.L. resides in Indiana.

116. B.L. learned of Grubbs through the pickleball community.

117. After some casual conversations with B.L., Grubbs offered B.L. the opportunity to invest in Rocks.

118. Grubbs provided B.L. with a copy of the Domination Plan. *Exhibit 26*.

119. Grubbs told B.L. that their investment would be used to purchase more inventory so Rocks could sell pickleball equipment to schools.

120. Grubbs also told B.L. that they could be prematurely repaid their investment should an emergency situation arise.

121. Thereafter, B.L. invested twenty-five-thousand dollars ($25,000.00) into Rocks.

122. B.L. was provided with a "Promissory Note (1)" ("PN1") dated May 4, 2022, but notarized May 3, 2022, wherein B.L. invested twenty-five-thousand dollars ($25,000.00) at "**Twelve Percent (12%) APR** . . . **compounded monthly" with** repayment "in one lump sum, made on or before November 4, 2023." (Emphasis maintained). *Exhibit 38*.

123. B.L. also entered into a separate "Promissory Note (2)" ("PN2") for twenty-five-thousand dollars ($25,000.00), with the same underlying terms as the PN1. *Exhibit 39*.

124. Like the PN1, the PN2 is dated May 4, 2022, but notarized May 3, 2022.

125. B.L. later invested another twenty-five-thousand dollars ($25,000.00) into Rocks.

126. B.L. was provided with a *second* PN2 dated August 11, 2022, but notarized August 10, 2022, wherein B.L. invested twenty-five-thousand dollars ($25,000.00) at "**Twelve Percent (12%) APR** . . . **compounded monthly**" with repayment "in one lump sum, made on or before February 11, 2024." (Emphasis maintained). *Exhibit 40*.

127. B.L. eventually made a fourth and final investment for twenty-five-thousand dollars ($25,000.00).

128. B.L. was provided with a "Promissory Note" dated August 23, 2022, but notarized August 22, 2022, wherein B.L. invested twenty-five-thousand dollars ($25,000.00) at "**Twelve Percent (12%) APR** . . . **compounded monthly**" with repayment "in one lump sum, made on or before February 23, 2024." (Emphasis maintained). *Exhibit 41*.

129. Despite having invested one-hundred-thousand dollars ($100,000.00), Grubbs continued to seek more investment from B.L.

130. Grubbs told B.L. that there was an opportunity for Rocks to sell a large number of paddles to schools, but he needed more money to buy those paddles.

131. However, B.L. declined to invest more into Rocks.

132. When repayment on B.L.'s first two (2) investments came due, B.L. reached out to Grubbs by phone and email.

133. Grubbs eventually responded by phone.

134. Grubbs told B.L. that he would be unable to repay B.L. on their PN1 and first PN2.

135. However, Grubbs told B.L. that he would meet with them and other investors to discuss shared concerns about repayment.

136. Grubbs later cancelled the meeting and told B.L. that his lawyer advised against him meeting with investors.

137. To date, B.L. has not been paid back on their investments.

*Investors J.B. and B.B.*

138. Investors J.B. and B.B. reside in Indiana.

139. J.B. and B.B. learned of Grubbs through their child, who is involved in the pickleball community.

140. Grubbs met J.B. and B.B. for lunch and discussed the opportunity to invest in Rocks at twelve percent (12%) interest, compounded monthly, over an eighteen (18) month term.

141. Grubbs also discussed Rocks' plan to make a high-profile hire and sell pickleball equipment to schools and colleges nationally.

142. Grubbs told J.B. and B.B. that any investment would not need to be reported to the Internal Revenue Service ("IRS").

143. Grubbs also told J.B. and B.B. that Rocks doesn't report such investments to the IRS either.

144. Grubbs told J.B. and B.B. that they could request their money back before the end of the eighteen (18) month term should "extenuating circumstances" arise.

145. Thereafter, J.B. and B.B invested twenty-five-thousand dollars ($25,000.00) into Rocks.

146. J.B. and B.B. were provided with a "Personal Promissory Note" ("PPN") dated May 24, 2022, but notarized May 20, 2022, wherein J.B. and B.B. invested twenty-five-thousand dollars ($25,000.000) at "**12% (Twelve Percent) APR interest** . . . **compounded monthly**" with repayment "in one lump sum, on or before **11/24/2023**." (Emphasis maintained). *Exhibit 42.*

147. After investing, J.B. and B.B. began to have concerns about their investment and asked Grubbs to be repaid several times before their PPN matured.

148. Respondents did not repay J.B. or B.B. before maturity of their PPN.

149. Grubbs later told J.B. and B.B. that Rocks had the opportunity to sell pickleball equipment to schools for a good return.

150. Thereafter, J.B. and B.B. invested an additional fifteen-thousand dollars ($15,000.00).

151. J.B. and B.B. were provided with a second PPN, dated and notarized August 16, 2023, wherein J.B. and B.B. invested fifteen-thousand dollars ($15,000.00) "plus an additional transaction fee of $1500," with "Principal and fee[5]" to be repaid "in one lump sum, on or before **02/16/2024**." (Emphasis maintained.) *Exhibit 43.*

152. After repayment on J.B. and B.B.'s first PPN became due, J.B. started contacting Grubbs about when they would be repaid.

153. Grubbs provided some excuses for the non-payment before he eventually stopped responding.

*Investors T.H. and J.H.*

154. Investors T.H. and J.H. reside in Indiana.

155. Grubbs solicited investment from T.H. and J.H.

156. T.H. had been selling pickleball paddles provided by Grubb's son (Zachary).

157. Thereafter, Grubbs offered T.H. the opportunity to invest in Rocks.

---

[5] Unlike J.B. and B.B.'s first PPN, no interest rate was specified.

158. Grubbs provided investors T.H. and J.H. with a copy of the Memo. *Exhibit 7*.

159. Grubbs also stated that he would appreciate investors T.H. and J.H. "keeping [the Memo] very private, since we don't want the general public to know how and why we have been able to grow so successfully." *Exhibit 44* at 2.

160. Grubbs emphasized the exclusivity of the investment opportunity, stating that "We have paid a locked 12% annual return to our investor friends for 9 years, so it is rare that anyone pulls out and leaves an available slot." *Id*. at 1.

161. Thereafter, T.H. and J.H. invested thirty-thousand-fifty-two dollars and sixty-nine cents ($30,052.69) into Rocks.

162. T.H. and J.H. were provided with a PPN dated July 7, 2023, but notarized August 29, 2023, wherein T.H. and J.H. invested thirty-thousand-fifty-two dollars and sixty-nine cents ($30,052.69) at "**12% APR interest** . . . **compounded monthly**" with repayment "in one lump sum, made on or before 1/7/2025." (Emphasis maintained). *Exhibit 45*.

163. T.H. and J.H. later invested another twenty-nine-thousand-nine-hundred-three dollars and sixty-nine cents ($29,903.69) into Rocks.

164. T.H. and J.H. were provided with a PPN dated October 19, 2023, but notarized January 16, 2023, wherein T.H. and J.H. invested twenty-nine-thousand-nine-hundred-three dollars and sixty-nine cents ($29,903.69) at "**12% APR interest** . . . **compounded monthly**" with repayment in "one lump sum, made on or before **4/19/2025**." (Emphasis maintained). *Exhibit 31*.

*Investor K.H.*

165. Investor K.H. resides in Indiana.

166. K.H. met Grubbs at a pickleball tournament around June 2022.

167. After some casual conversations, Grubbs offered K.H. the opportunity to invest in Rocks at twelve-percent (12%) interest.

168. Grubbs told K.H. that there were only a couple opportunities left to invest in Rocks.

169. Grubbs also told K.H. that they should not discuss this investment opportunity with anyone else.

170. Grubbs provided K.H. with a copy of the Domination Plan. *Exhibit 26.*

171. Thereafter, K.H. invested fifty-thousand dollars ($50,000.00) into Rocks and was provided with two (2) separate twenty-five-thousand dollar ($25,000.00) promissory notes.

172. Both of K.H.'s promissory notes were due for repayment by January 1, 2024.

173. To date, K.H. has not been repaid.

## V. VIOLATIONS OF THE INDIANA UNIFORM SECURITIES ACT
### Counts 1- 5: I.C. § 23-19-5-1:
#### Securities Fraud

174. This section incorporates by reference all preceding sections and paragraphs.

175. Pursuant to I.C. § 23-19-5-1:

> "It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:
>
> (1) to employ a device, scheme, or artifice to defraud;
>
> (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

176. By soliciting multiple investors with a Memo that implies each investor can take the same *one last available slot* in a limited investment opportunity, respondents violated I.C. § 23-19-5-1.

177. By urging multiple investors provided with the same Memo not to discuss their investment in Rocks with others, respondents violated I.C. § 23-19-5-1.

178. By issuing a Memo that explains respondents need more investment so they can pay back prior investors, respondents violated I.C. § 23-19-5-1.

179. By failing to pay back investors their principal and interest on matured promissory notes while continuing to seek new investment, respondents violated I.C. § 23-19-5-1.

180. By soliciting multiple investors with the promise their funds would be used exclusively for inventory purchases, respondents violated I.C. § 23-19-5-1.

## Counts 6- 22: I.C. § 23-19-3-1

## Offer or Sale of Unregistered and Nonexempt Securities

181.  This section incorporates by reference all preceding sections and paragraphs.

182.  Pursuant to I.C. § 23-19-3-1:

> "It is unlawful for a person to offer or sell a security in this state unless:
>
>> (1) the security is a federal covered security;
>>
>> (2) the security, transaction, or offer is exempted from registration under IC 23-19-2-1 through IC 23-19-2-3; or
>>
>> (3) the security is registered under this article."

183.  By selling an unregistered and nonexempt promissory note to investor H.W. on or about January 29, 2020, respondents violated I.C. § 23-19-3-1.

184.  By selling an unregistered and nonexempt promissory note to investor S.G. on or about March 3, 2021, respondents violated I.C. § 23-19-3-1.

185.  By selling an unregistered and nonexempt promissory note to investor W.H. during or around October 2021, respondents violated I.C. § 23-19-3-1.

186.  By selling an unregistered and nonexempt promissory note to investor S.G. on or about March 3, 2022[6], respondents violated I.C. § 23-19-3-1.

187.  By selling an unregistered and nonexempt promissory note to investor A.B. during or around May 2022, respondents violated I.C. § 23-19-3-1.

188.  By selling an unregistered and nonexempt promissory note to investor B.L. on or about May 4, 2022, respondents violated I.C. § 23-19-3-1.

189.  By selling another unregistered and nonexempt promissory note to investor B.L. on or about May 4, 2022, respondents violated I.C. § 23-19-3-1.

190.  By selling an unregistered and nonexempt promissory note to investors J.B. and B.B. on or about May 24, 2022, respondents violated I.C. § 23-19-3-1.

191.  By selling an unregistered and nonexempt promissory note to investor S.G. on or about June 27, 2022, respondents violated I.C. § 23-19-3-1.

192.  By selling an unregistered and nonexempt promissory note to investor B.L. or on or about August 11, 2022, respondents violated I.C. § 23-19-3-1.

---

[6] Although Grubbs claimed this was a "roll over" despite the underlying promissory note not having matured, this was effectively a new promissory note.

193.  By selling an unregistered and nonexempt promissory note to investor B.L. on or about August 23, 2022, respondents violated I.C. § 23-19-3-1.

194.  By selling an unregistered and nonexempt promissory note to investor H.W. on or about January 29, 2023[7], respondents violated I.C. § 23-19-3-1.

195.  By selling an unregistered and nonexempt promissory note to investors T.H. and J.H. on or about July 7, 2023, respondents violated I.C. § 23-19-3-1.

196.  By selling an unregistered and nonexempt promissory note to investors J.B. and B.B. on or about August 16, 2023, respondents violated I.C. § 23-19-3-1.

197.  By selling an unregistered and nonexempt promissory note to investors T.H. and J.H. on or about October 19, 2023, respondents violated I.C. § 23-19-3-1.

198.  By selling an unregistered and nonexempt promissory note to investor K.H. prior to January 1, 2024, respondents violated I.C. § 23-19-3-1.

199.  By selling another unregistered and nonexempt promissory note to investor K.H. prior to January 1, 2024, respondents violated I.C. § 23-19-3-1.

## VI.    RELIEF REQUESTED

Wherefore, the Division respectfully requests that the Commissioner take the following actions:

a.  Find that respondents violated the IUSA, pursuant to I.C. § 23-19-6-2(a)(1);

b.  Order respondents to cease and desist from the offer and sale of securities, pursuant to I.C. § 23-19-6-4(a)(1);

c.  Order respondents to stop engaging in any acts or conduct that violate the IUSA, Rules, and the Commissioner's Administrative Orders, pursuant to I.C. § 23-19-6-4(a)(1);

d.  Impose a civil penalty in an amount not to exceed ten-thousand dollars ($10,000.00) for each violation committed by respondents, pursuant to I.C. § 23-19-6-4(d);

e.  Order respondents to pay the costs of investigation of this matter, pursuant to I.C. § 23-19-6-4(e);

f.  Find that all the sanctions and remedies detailed herein are in the public interest and necessary for the protection of Indiana investors, pursuant to I.C. § 23-19-6-4; and

g.  Grant such other and further relief, as the Commissioner deems appropriate, pursuant to I.C. § 23-19-6-4.

---

[7] Although the note reads "AMENDMENT" this was effectively a new promissory note.

Respectfully submitted,

OFFICE OF THE INDIANA

SECRETARY OF STATE,

SECURITIES DIVISION

By: _____

Scott A. Probert, #36934-49

Enforcement Attorney

302 W. Washington St., Room E-111

Indianapolis, IN 46204

317-232-8651

SProbert1@sos.in.gov